# The Commonwealth versus The Delaware and Hudson Canal Company and Pennsylvania Coal Company.

*Power of Supreme Court to control the improper exercise of Corporate Powers.—Statutory Remedy and Proceedings under it, when invalid.—Validity of Contract between Delaware and Hudson Canal Company and the Pennsylvania Coal Company, examined.*

1. The state has power to inquire, and the Supreme Court authority to try, by writs of mandamus or quo warranto, whether or not a contract entered into between two corporations is in excess of the legitimate power of either: and if either corporation is exercising powers or franchises not granted to it, to oust it from the exercise thereof, whether the authority be exercised in the common law or equity form, provided the right of trial by jury is not interfered with.

2. By Act of Assembly 6th May 1862, the Attorney-General was directed by process in law or equity to bring before the Supreme Court the Delaware and Hudson Canal Co. and the Pennsylvania Coal Co., to show by what authority they executed a certain agreement between them, and if upon investigation the agreement should appear to be in excess of their corporate powers, and they or either of them should refuse to annul it, the party refusing shall be proceeded against for the purpose of annulling their charter: on information by the Attorney-General, it was *Held*, that though the proceedings to investigate directed by the act were proper, the remedy provided was not in due course of law: and that all the proceedings directed by the act after the direction therein for their institution, were invalid.

3. Where the agreement granted to the coal company all the facilities of navigation which the canal would afford, not exceeding one-half of its whole capacity, it is not invalid because a monopoly of that half to the exclusion of the public, as against other carriers of coal, unless it appear that the public is injured, or that either company has thereby exercised some function that is exclusive of the public right.

4. Though instead of fixed tolls to be collected at the locks according to the charter, the agreement provides for a rate of toll to be ascertained by the market price of coal in every year, the objection involves no public grievance, for the canal company has the right to commute its tolls.

5. Nor is it a valid objection that on account of the uncertainty of the toll, the Canal Company cannot always know how much to demand of others, and cannot thus do equal justice to all, where there is no evidence that the public or any private person has suffered wrong thereby, or that the canal company has been compelled to exercise functions not belonging to it.

6. Measuring tolls by the profits on the coal carried, when sold, does not constitute the canal company a speculative dealer in coal: there is no public wrong in such a contract for the commutation of tolls.

7. To authorize interference with the contract because it affects the interest and income of the state, evidence must be produced that such acts have been done as affect the state and contrary to the charter.

8. If the coal company sacrifice the regular profits or a part, to control the coal market, the remedy is compensation under the equity of the agreement, rather than its cancellation: for the objection is founded on the abuse of the agreement rather than the nature of it.

In the Supreme Court of Pennsylvania. Sitting in Equity.

This was an information filed May 17th 1862, by the Attorney-General of the Commonwealth, in pursuance of an Act of Assembly approved May 6th 1862, in these words:—

And now, 17th May 1862, comes William M. Meredith, Attorney-General of the Commonwealth, and gives the court here to understand and be informed: That the Delaware and Hudson Canal Company is a corporation established by Acts of Assembly of the state of New York, and to which have been granted certain franchises by Acts of Assembly of this Commonwealth, as by the several Acts of Assembly of the state of New York and of this Commonwealth, copies of which are hereto annexed, reference being had thereto, will more fully appear. That the Pennsylvania Coal Company is a corporation established by Acts of Assembly of this Commonwealth, as by the said several acts, copies of which are hereto annexed, reference being thereto had, will more fully appear. That the said companies have respectively made and constructed the canal and railroad, which by the said several acts they were respectively authorized to make and construct, and that the said Pennsylvania Coal Company hold certain coal lands in this Commonwealth, in which they mine coal and transport the same to market for sale, by way of their said railroad and the said canal. That on the 31st day of August, in the year 1847, a certain agreement was made between the Delaware and Hudson Canal Company and the Wyoming Coal Association, who afterwards assigned the same to the Pennsylvania Coal Company, of which a copy is hereto annexed, and which is the same agreement referred to in the Act of Assembly, approved on the 6th day of May instant, hereinafter recited.

That, on the 29th of July 1851, a certain agreement was made between the said canal company and the Pennsylvania Coal Com-

pany, of which a copy is hereto annexed. That it is alleged that the above-mentioned agreements were, and are, in excess of the legitimate power of the said Delaware and Hudson Canal Company and the said Pennsylvania Coal Company respectively.

That, on the 6th day of May instant, an Act of Assembly was duly approved, entitled "An Act authorizing proceedings against the Pennsylvania Coal Company and the Delaware and Hudson Canal Company," of which the following is a copy, viz. :—

"Section 1. Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same, That the attorney-general of this Commonwealth is hereby directed, within sixty days after the passage of this act, by such process in either law or equity, to bring before the Supreme Court the Delaware and Hudson Canal Company and the Pennsylvania Coal Company, to show by what authority they executed a certain agreement between said companies, bearing date the thirty-first day of August, Anno Domini one thousand eight hundred and forty-seven, by which said Delaware and Hudson Canal Company leased to said railroad company one-half of the capacity of their canal, and if upon such investigation it shall appear that said agreement was or is in excess of the legitimate power of said corporators, and they or either of them shall refuse to annul the same, the party so refusing shall be proceeded against for the purpose of annulling their charter, and in case the attorney-general shall not be satisfied that he can carry out the object of the foregoing provisions under existing laws, he shall report to the next legislature what further enactments may be necessary for that purpose."

Whereupon the said attorney-general, in behalf of the Commonwealth, prays that writs of subpœna may be awarded, directed to the said Delaware and Hudson Canal Company and Pennsylvania Coal Company, commanding them to appear at a day certain, and answer touching and concerning the premises aforesaid, and especially to state whether the Acts of Assembly of the state of New York and of this Commonwealth, herein above referred to, are fully and correctly set forth, and whether they, or either of them, did execute the several agreements herein above referred to, and whether the copies of said Acts of Assembly and agreements hereto annexed are true and correct copies of the same respectively, and to show by what authority they executed the said several agreements; and that the court will, after full investigation of the several matters herein set forth, if it shall appear that the said agreements were and are in excess of the legitimate power of the said corporations, or either of them, decree the same to be so, and make such further order and decree

in the premises as may be agreeable to equity, and in accordance with the provisions of the last-recited Act of Assembly.

Signed, W. M. MEREDITH,
May 17th 1862. Attorney-General.

The agreement referred to in the information, after reciting amongst other things, in substance and effect, that it was not for the interest of the canal company that the surplus capacity of its canal for transportation ·should remain unemployed; that no company would prudently undertake to construct a "railway connecting with it without a certainty of being allowed to transport thereon at a permanent rate of tolls; that with a view to induce capitalists to invest their funds in the construction of a railroad to be connected with the canal, the company had offered a permanent tariff of tolls on all coal entering the canal on any such railroad; provides that the canal company will at all times hereafter furnish to any and all boats owned or used by the Wyoming Coal Association for the time being, or its assigns, for the purpose of transporting coal entering the canal by railroads connecting with the canal, &c., &c., all the facilities of navigation and transportation which the canal shall afford, when in good and navigable condition and repair, to boats owned or used by any other company or persons, or belonging to or used by or containing coal transported for the canal company, charging and collecting a toll on the coal at a rate per ton to be established in the manner following, viz.: On the 1st day of May in each and every calendar year the quantity of lump coal of the said Delaware and Hudson Canal Company, which shall at that time have been sold to be delivered at Rondout, and to arrive by the said canal during the said calendar year, shall be ascertained, and the average price at which such sales have been contracted, shall also be ascertained, and from the average price thus ascertained, $2.50 shall be subtracted, and one-half of the remainder shall be the toll per ton during such calendar year, except that if any discount or deduction, contingent or otherwise, shall be agreed upon or contemplated in the contracts for such sales, the said .toll shall be reduced correspondingly to such discount or deduction as shall be actually made. But provided, nevertheless, that if on the 1st day of May, in any calendar year, the quantity of lump coal of the said Delaware and Hudson Canal Company, which shall at that time have been sold as aforesaid, shall be less than one-half the estimated sales for such year, the toll during such year shall be calculated in the manner hereinbefore provided on the average price at which the sales of lump coal for such year shall be actually made; and if in any calendar year no sales of the coal of the Delaware and Hudson Canal Company shall be made, then and in that case the toll during such year

shall be calculated on the sales for such year of the lump coal of the Wyoming Coal Association for the time being, or its assigns, in the manner hereinbefore provided for, calculating the toll on the sales of the said Delaware and Hudson Canal Company. And in case of an enlargement of the said canal, the said president, managers, and company, and their successors and assigns, may also charge and collect an additional toll on the coal transported in pursuance of this agreement, at a rate per ton of 2240 pounds, to be established after the completion of the said enlargement, in the manner following, viz.: The cost of transportation per ton on the said canal, between the point at which such coal shall enter the said canal and the point on the Rondout creek, at which the said canal meets tidewater, after the full effect of all the improvements previous to the said enlargement shall have been experienced, shall be fairly ascertained or established; the cost of transportation per ton on the said canal between those points after the said enlargement shall have been completed shall also be fairly ascertained or estimated, and one-half of such portion of the reduction in the cost of transportation per ton on the said canal between those points as shall be estimated to have been produced by the said enlargement, and by no other cause, shall be the additional toll per ton to be thereafter permanently charged."

The contract then provides that until such enlargement the canal company shall not be bound to allow over 400,000 tons to be transported over the canal in any one season, and that after such enlargement it shall not be bound to allow such quantity to be increased so as to exceed in any one season "one-half of the whole capacity for transportation of the said canal, exclusive of the tonnage employed in the transportation of articles other than coal," and the main question was, whether this agreement, made on the 31st day of August 1847, between the canal company and the Wyoming Coal Association, and renewed with the Pennsylvania Coal Company, was in excess of the legitimate power of said parties.

The defendants were not agreed as to the validity of the contract, the Hudson Canal Company insisting that it was and is contrary to law, while the coal company claimed that it is a valid and binding agreement as between the parties. Separate answers to the information were filed by the defendants, but as the objections to the agreement are all contained in the answers of the canal company, and are sufficiently stated in the opinion of this court, it is unnecessary to repeat them here.

The case was elaborately argued in this court by *Wm. M. Meredith,* Attorney-General for the Commonwealth, by *Stanley Woodward, St. G. T. Campbell, G. M. Wharton,* and *W. L. Hirst,* for the Delaware and Hudson Canal Company, and by

[Commonwealth *v.* Delaware & Hudson Canal Co.]

*David Webster, John C. Knox,* and *Jeremiah S. Black,* for the Pennsylvania Coal Company.

The opinion of the court was delivered, January 5th 1863, by Lowrie, C. J.—We cannot doubt that in the case of The Delaware and Hudson Canal Company *v.* The Pennsylvania Coal Company, pleaded in this case and reported in 9 Harris 131, and as between the parties thereto, it was conclusively decided that the contract had been legally made and that the then plaintiff had no valid ground for claiming its cancellation. The purpose of the bill in that case was to obtain cancellation, and asked for nothing more except the natural consequences of cancellation; that is, the staying of a suit of the defendant founded on the contract, and his prevention from using the plaintiff's canal under it. The prayer for general relief could embrace no more, because there were no averments that aimed at or would support any other purpose.

But now the state, in the exercise of its visitorial authority, interferes to try whether or not that contract is "in excess of the legitimate power" of either of these corporations. No doubt the state has this authority. It usually asserts it through the instrumentality of writs of *mandamus* and *quo warranto,* or of information in law or equity in the nature of the *quo warranto.* It might be doubted whether an information in the equity form would be recognised as generally proper in a case of this kind; but there can be no objection to it in this case, since it is here specially authorized, and no right can be injured by it. (This court has authority to try whether any corporation is exercising franchises or functions not granted to it, and oust it from the exercise of such:) Quo Warranto Act of 1836, §§ 1, 5, and 11; 1 Palmer 82; 1 Ld. Raym. 426; 1 Stra. 627; 2 Rolle 115; 4 Mod. 158; 1 Show. 278; and it is a matter of no importance to the parties whether this authority is exercised in the common law or in the equity form, provided the right of trial by jury is not interfered with, as it cannot be in this case.

The state never interferes in order to assert the rights of either of the parties as against the other, except by the trial of a suit of one against the other: and therefore, in this case, it asks for no retrial of the old issues between the parties that were decided in the former case. It simply asserts a usurpation of franchises or functions not granted by the state: 15 S. & R. 132; and this it may do even though one of the parties may have taken the same ground in the former action: because the state was not a party to that proceeding, and because a party may be sometimes estopped from making his own wrongful act a ground of defence: and thus the question is rather excluded than tried.

This case is instituted in pursuance of an Act of Assembly

[Commonwealth v. Delaware & Hudson Canal Co.]

which directs the attorney-general, by process in law or equity, to bring these defendants before this court, that it may be investigated whether or not this agreement is in excess of their legitimate power as corporations. Thus far we interpret the act without any trouble, by supposing it to mean what is usual in judicial proceedings; and if nothing else had been said, we should ·have inferred that an action properly commenced under this direction must go on in the usual course of the law to final judgment and execution.

But the act, instead of stopping here, provides further, that, in case the contract be found to be in excess of the legitimate power of the said corporations, and in case either of them shall refuse to annul it, then process shall be instituted for the purpose of annulling the · charter of the one so refusing. Such a form of remedy is strange and unaccountable, and quite out of the due course of law. Possibly the framer of the law supposed that a *quo warranto* could not be used against such a fault without a judgment that would declare all the corporate franchises forfeited, and framed the bill so as to avoid so extreme a result. We have found this opinion prevalent, but it is a mistake: for a leading purpose of the remedy is to prevent corporations and officers from usurping an ungranted franchise or function at which it is aimed, and then the judgment always is that they be excluded or ousted of that, without affecting the corporations or officers in regard to any of their proper franchises or functions. The Act of Assembly and the cases already referred to ·show this, and most cases against corporations are of this sort.

Surely, if the legislature had known that on an information in the nature of *quo warranto*, the judgment that follows a finding of a usurpation of functions is, that the defendants be hereafter excluded from the exercise of them, it would not have required us to ask the defendant to consent to an exclusion, and then have subjected them to a forfeiture of their charters, by another process, in case of their refusal. Such legislation would be plainly chargeable with the vice of being *ex post facto*, whether the penalty is for the usurpation or for the refusal to repent of it. The penalty annexed by due course of law to the usurpation of functions is ouster to the extent of the usurpation and costs. We must therefore treat all the provisions that follow the order for the institution of the proceeding as invalid and supererogatory; and having jurisdiction of the case by the information, we must proceed to the final adjudication of it in due course of law according to the nature of the process.

The information alleges that the agreement in controversy is in excess of the legitimate power of these corporations, and prays that it may be so declared by this court, and that the defendant may be enjoined from acting under it, and also that they may

[Commonwealth *v.* Delaware & Hudson Canal Co.]

be required to appear and consent to or refuse its cancellation, and for such other decree as may be agreeable to equity. The information would have been formally and substantially improved if it had specially suggested wherein the agreement is in violation of the corporate rights of the defendants. But we may treat this defect as supplied by the answers of the defendants.

The defendants have got into a quarrel among themselves about the agreement, and the canal company confesses and claims that the agreement is contrary to law, while the coal company insists that it is not, and claims that it shall stand as the bond and law of the relations between the parties. It is therefore in the answer of the canal company that we find the objections to the contract specified, and we proceed to consider them.

1. It is objected that the agreement grants to the coal company a monopoly of the one-half of the capacity of the canal of the other party, to the exclusion of the public, because it contracts to furnish to the coal company all the facilities of navigation which the canal will afford, not exceeding one-half of its whole capacity, inclusive of the tonnage employed in the transportation of articles other than coal.

This leaves to all property other than coal its full right of transportation on the canal; but it does profess to give the coal company a right, as against other carriers of coal, to a preference to the extent of one-half the capacity of the canal. And this may be wrong if it interferes with the claims of others to have their coal carried as cheaply and speedily as that of the coal company. But there is no complaint that anybody has been wronged by this, or that either company has by this actually exercised any function that is exclusive of the public right. When the defendants do in fact transgress the limits of their legitimate functions and interfere with the public rights, then will be the time to bring a charge against them. A mere intention or contract to allow an act that may be wrong, is no ground for an information in law or equity in the nature of the *quo warranto*.

2. It is objected that the agreement, instead of fixed tolls to be collected at the locks according to the charter of the canal company, provides for a rate of toll to be ascertained by the market price of coal in every year, and thus the rate of toll remains uncertain until this price is ascertained, and it cannot therefore be demanded at the locks, and may, in certain states of the coal market, exceed the toll allowed by the charter.

We do not see that this objection involves any public grievance. The canal company has a right to commute its tolls; and we cannot see that the public has any interest in objecting that it may get too much, under the contract of commutation, in a certain contingency, or that it has contracted away part of its

means of obtaining the little that it agrees to accept under the contract.    At all events, the agreement is, by itself, no actual transgression of proper functions.

3. But the above objection is repeated on behalf of the public; that, on account of the uncertainty of the toll, the canal company cannot always know how much to demand of others, and therefore cannot do equal justice to all according to its public duty as a canal company: 12 Harris 138; 10 M. & W. 398.

But we find no averment or pretence that the public or any private person has suffered any wrong by reason of this, or that the canal company has been compelled, in obeying this part of the contract, to exercise any functions that do not properly belong to it as a canal company. If it really means to be honest towards the public, we doubt not that it will be able to discover some such reasonable rule of equality in dealing with other carriers that the public will have no reasonable ground of complaint.    Exact equality is not demanded, but such a reasonable approximation to it as can be secured by reasonable general rules, free from mere arbitrariness.

4. It is objected that because the tolls are fixed at half the proceeds of the coal after deducting the estimated costs of the production, therefore the canal company is a speculative dealer in coal, which is a departure from the purposes of its creation.

We do not perceive that the conclusion follows from the premises.    Measuring toll by the profits on the article when sold, is not becoming a dealer in coal, else government would be a dealer in articles that are subjected to an *ad valorem* tariff.    It is very common for the state to measure taxes according to supposed profits, and we find no public wrong in the canal company doing so in its contract of commutation of tolls.

5. It is objected that such a contract, to be valid, ought to have the sanction of the legislature, because it affects the interest and income of the state.

But it is not any way shown to us that it does so.    Nothing like this is averred in the information, and of course we cannot assume it.    If either of these corporations *do* anything under the contract to the interest and income of the state, and contrary to its charter, and this be shown to us in any regular manner, we shall probably interfere and correct it.    But we can do nothing arbitrarily.    We must have some definite allegation and proof of usurpation before we can do anything.    The allegation of mere probabilities of wrong raises no question for our interference.

6. It is objected that, since, under the contract, the tolls are measured by the profits, the coal company has the power by sacrificing the regular profits or a portion of them, to control the coal market, and may at its pleasure so depress the price as

to ruin many of those engaged in the trade, and greatly disturb the public interest without any serious injury to itself, and that it did so last spring.

If this had been averred in the information, and proved as one of the grounds of the complaint against the agreement, we should have regarded it as the most serious one of all those that have been urged; but it is neither alleged nor proved by the Commonwealth. And we incline to think that it is properly so, for it seems to us that this objection is founded rather on the abuse of the agreement than on the nature of it, and that the remedy ought to be compensation under the equity, if not the letter, of the agreement, rather than cancellation of it.

Nothing can be more obvious than that the parties intended to adopt a standard by which the tolls were to be indirectly measured. But that can be no standard that may be controlled entirely by the will of either party, and neither can be supposed to have intended such a measure of value. They both meant to fix a standard independent of themselves, and in the public market where we look for the natural standard of value. Both of them, as dealers in the market, would have an influence in fixing the market price, and therefore the standard; but neither of them, dealing according to the fair laws of the trade and of competition in it, could control this standard or would attempt to do it. That is a standard that may well be appealed to, because it is never merely arbitrary, and in trade and in law it is constantly appealed to.

These parties are large dealers in coal, and therefore their sales are, by the agreement, to be taken as a means of ascertaining the market price, and not for the purpose of giving either of them the power to fix that price, or with the thought that either of them might do so. If they arbitrarily use their power to change the standard, they necessarily destroy its authority as a standard as in their favour; for it is not their will, but the fair market price that is appealed to.

We are not entitled in this case to inquire how far a trading corporation is liable to control or punishment for recklessly raising or depressing prices, for our sole inquiry is concerning the legality of this agreement. We cannot discover any such illegality in it as would justify us in directing its cancellation. Some of the allegations of the canal company seem to show a great abuse of the agreement by the coal company, but the information is in no degree grounded on that, and we cannot inquire of it, and we must volunteer no opinion as to the fact or its consequences or remedy.

Information dismissed.