STATE OF TENNESSEE, *ex rel.* CHARLES T. CATES, JR., At-
torney-General, v. STANDARD OIL COMPANY OF
KENTUCKY.

(*Nashville.* December Term, 1907.)

1. **CONSPIRACY AND RESTRAINT OF TRADE.** Bill to oust
a foreign corporation sufficiently stating the terms and provis-
ions of the agreement or combination in restraint of trade.

Where a bill to oust a foreign corporation from the State and
to restrain it from doing business within the State, on the
ground of an alleged agreement in restraint of trade, charged
that the defendant and its certain named agents made an agree-
ment to procure the cancellation of orders previously obtained
by a competing company, through promises to give to the respec-
tive purchasers of such oil, certain various named quantities of
its oil gratis, which it did thereafter give, with a view to lessen-
ing competition in the sale of defendant's oil then being sold and
offered for sale in the county where the agreement, arrangement,
or combination was made, and that such agreement tended to
lessen competition, and was designed to advance and tended
to advance the price of defendant's oil to the consumer, and
was made for the purpose of enabling defendant to retain its
monopoly in the sale of oil, and to keep and use the power to
advance the price, which it thereafter did, the bill was not
defective for failure to state the terms of the agreement, ar-
rangement or combination charged, but sufficiently stated a
cause of action. (*Post, pp.* 103-115.)

Cases cited and approved: State v. Witherspoon, 115 Tenn., 140;
Standard Oil Co. v. State, 117 Tenn., 618.

2. **DEMURRER.** Presumption in favor of a bill in chancery up-
on demurrer thereto.

Every reasonable presumption will be made in favor of a bill in
chancery, when assailed by a demurrer, and, if, upon a critical

State v. Standard Oil Co.

examination of the facts stated in the bill, there is a possibility that the suit may be sustained, though upon a different ground from that assumed, a demurrer to the whole bill will be overruled. The complainant should have an opportunity to be heard upon the merits of his case, when any equity whatever appears in his bill, although defectively stated. (*Post,* p. 108.)

Code cited and construed: Sec. 4605 (S.); sec. 3596 (M. & V.); sec. 2884 (T. & S. and 1858).

Cases cited and approved: Thompson v. Paul, 8 Humph., 117; Lincoln v. Purcell, 2 Head, 143; Hobbs v. Railroad, 9 Heisk., 879; Hobbs v. Railroad, 12 Heisk., 531; French v. Dickey, 3 Tenn. Chy., 302; Trafford v. Wilkerson, 3 Tenn. Chy., 449; Kerr v. Kerr, 3 Lea, 224; Anderson v. Mullenix, 5 Lea, 287.

3. **QUO WARRANTO.** Writ was never in force in this State.

Neither the writ of *quo warranto* nor the information in the nature thereof was ever in force in this State. (*Post, pp.* 130-137.)

Code cited and construed: Secs. 5165-5187 (S.); secs. 4146-4188 (M. & V.); secs. 3409-3431 (T. & S. and 1858).

Cases cited and approved: State v. Turk, M. & Y., 287, 293; Bradley v. Commissioners, 2 Humph., 427; State v. Insurance & Trust Co., 8 Humph., 235; Attorney-General v. Leaf, 9 Humph., 753; State v. Scott, 2 Swan, 332; State v. Turnpike Co., 2 Sneed, 254; Johnson v. Churchwell, 1 Head, 146; State, ex rel., v. Wright, 10 Heisk., 237, 244; State v. Turnpike Co., 1 Tenn. Cas., 511; Hooper v. Rhea, 3 Tenn. Cas., 145, 151, 152; State v. McConnell, 3 Lea, 332, 335, 338; State v. Campbell, 8 Lea, 74, 76; State v. Agee, 105 Tenn., 588; State, ex rel., v. Turnpike Co., 112 Tenn., 615; State, ex rel., v. Telephone & Telegraph Co., 114 Tenn., 194; and numerous cases in other jurisdictions cited in the opinion, on page 135.

State v. Standard Oil Co.

4. **FOREIGN CORPORATIONS.** Bill to forfeit franchise of a foreign corporation to do business within the State is a civil suit, and not a criminal one.

Where a suit is brought by the attorney-general, on behalf of the State, to forfeit the franchise of a foreign corporation to do business within the State on the ground of an alleged conspiracy in restraint of trade, by a bill in chancery setting forth, without technical forms, the ground on which the suit is instituted, to be conducted as other suits in equity, in which issues of fact may be made up and tried by a jury and a decree entered according to the practice of courts of chancery, such suit is a civil proceeding, to which the rules applicable to criminal law do not apply. (*Post, pp.* 115-143.)

Code cited and construed: Secs. 5165-5187 (S.); secs. 4146-4158 (M. & V.); secs. 3409-3431 (T. & S. and 1858).

Acts cited and construed: Acts 1845-46, ch. 55; Acts 1903, ch. 140.

Constitution cited and construed: Art. 1, sec. 14.

Cases cited and approved: State, ex rel., v. Brewing Co., 104 Tenn., 715, 748, 751, and the same Tennessee cases as under headnote 3, and numerous cases in other jurisdictions cited in the opinion, on pages 122-135.)

5. **CONSTITUTIONAL LAW.** Classification in punishment of corporations and natural persons is valid, when.

A statute declaring that the charters of domestic corporations and the license of foreign corporations to do business within this State shall be forfeited for the making of agreements with a view to restrain trade in certain articles, and declaring that any person becoming a party to such an agreement is punishable by fine or imprisonment or both, is not invalid for such discrimination in the punishment of corporations and natural persons. There is sufficient basis for the classification between corporations and natural persons in the fact that corporations cannot be subjected to imprisonment, and natural

State v. Standard Oil Co.   .

persons cannot be deprived of business or charter rights or of the power to exercise business or charter rights within the State, through a judgment of ouster. (*Post, pp.* 139-143.)

Acts cited and construed:   Acts, 1903, ch. 140.

6.  **FOREIGN CORPORATIONS.  Have no absolute rights in the State, and may be expelled by law.**

Foreign corporations have no contract rights in the State in which they are permitted to do business.   They are in such State and do business there on sufferance as guests of the State, and they cannot complain of the procedure which the State has adopted to determine whether such corporations have abused the courtesy shown them, and have thereby forfeited their rights to remain. (*Post, pp.* 143, 144.)

Case cited and approved:   Insurance Co. v. Craig, 106 Tenn., 621, 641 et seq.

7.  **STATUTES OF LIMITATIONS.  None is applicable to the State in civil actions, such as a suit to oust a foreign corporation.**

There is no statute of limitation applicable to the State in civil actions, such as a suit to oust a foreign corporation from the State and to restrain it from doing business within the State. (*Post, pp.* 144, 145.)   See headnote 4.

Code cited and construed:   Secs. 4453, 6942-6945 (S.); Secs. 3456, 5808-5811 (M. & V.); secs. 2762, 4983-4986 (T. & S. and 1858).

Acts cited and construed:   Acts 1903, ch. 140, sec. 3.

Cases cited, approved, and distinguished:   Turley v. State, 3 Heisk., 11; Rafferty v. State, 91 Tenn., 655, 657, 658.

8.  **CONSTITUTIONAL LAW.  Anti-trust statute not violating interstate commerce provision of the federal constitution.**

A statute prohibiting agreements between persons or corporations with a view to restrict "competition in the importation or sale of articles imported into this State, or in the manufacture or sale of articles of domestic growth or of domestic raw material, . . . or which tend to advance, reduce, or control the price or cost to the producer or the consumer of any such

State v. Standard Oil Co.

product or article," and declaring such agreements "to be against public policy, unlawful, and void," and providing penalties for the making of such agreements, is properly construed as intended to apply to intrastate commerce, and not to interstate commerce, and is not in violation of the constitution of the United States (art. 1, sec. 8) vesting in congress the power to regulate interstate and foreign commerce. (*Post, pp.* 145-152.)

Acts cited and construed: Acts 1903, ch. 140.

U. S. constitution cited and construed: Art. 1, Sec. 8.

Case cited and approved: Standard Oil Co. v. State, 117 Tenn., 618, and citations.

9. **EVIDENCE.** Secondary evidence of a lost paper prepared in triplicate is not admissible without accounting for nonproduction of all the copies, when.

Where a report made by a servant to his superior was prepared in triplicate, one of the copies being retained by the servant, one being sent to the superior, and one to another office of the employer corporation and principal, all these reports were originals, and secondary evidence of the contents of the report was inadmissible, upon proof of the loss of the two originals which were sent out, without accounting for the nonproduction of the one retained by the maker. (*Post, pp.* 152, 153.)

10. **SAME.** Copy of the copy of a letter copied into a transcript of record is not admissible where there is a letter-press copy, and the original is not accounted for.

Where a paper offered in evidence purports to be a copy of a copy of a letter copied into a transcript on file in the supreme court, is properly rejected and excluded as evidence of the contents of the letter, where there appears to be a letter-press copy of the same under the control of the party offering the same, and where the absence of the original is not properly accounted for. (*Post, pp.* 153, 154.)

State v. Standard Oil Co.

11. SAME. Letter-press copy is not admissible if not proved to be such, nor where the original is not accounted for.

A letter-press copy of a letter written by an officer of a corporation to its special agent is not admissible where it is not sufficiently proved to be a letter-press copy, and where the original is not accounted for. (*Post, pp.* 154-156.)

12. CONSPIRACY. A corporation and its officer or agent may both be counted as the necessary number to constitute a conspiracy.

Under statute (Acts 1903, ch. 140) and independent of statute upon principle, and jn furtherance of sound public policy both a corporation and its officers and agents who engage in a conspiracy to restrain trade must be held to be parties to it, and be counted in computing the necessary number of two or more to constitute an unlawful conspiracy. (*Post, pp.* 173, 174.)

Case cited and approved: Standard Oil Co. v. State, 117 Tenn., 618, 663-670.

13. FOREIGN CORPORATIONS. In ouster suit for combination in restraint of trade, acts of the agents and knowledge of officers are chargeable to the corporation, when; evidence considered sufficient.

A suit to oust a foreign corporation from the State and to restrain it from doing business within the State on account of a combination or agreement made by it in restraint of trade may be successfully maintained, where the evidence warrants the finding that the combination or agreement was made for it by its agents acting within the scope of their authority and with the knowledge of the responsible officers of the corporation. Under such circumstances, the corporation is responsible for the acts of its agents. The evidence is stated and reviewed and held to be sufficient to warrant such finding. (*Post, pp.* 156-179.)

Cases cited and approved: Bailey v. Master Plumbers, 103 Tenn., 118, 119; Standard Oil Co. v. State, 117 Tenn., 618; and numerous cases in other jurisdictions cited in the opinion, on pages ——.

FROM SUMNER.

Appeal from the Chancery Court of Sumner County. —J. W. STOUT, Chancellor.

ATTORNEY-GENERAL CATES, District Attorney.

PECK, and W. A. GUILD, for State.

JOHN J. VERTREES, WM. O. VERTREES, and J. W. BLACKMORE, for defendant.

MR. JUSTICE NEIL delivered the opinion of the Court.

The bill in this case was filed for the purpose of ousting the defendant from the State and to obtain a perpetual injunction against its doing business in the State.

There was a demurrer filed, which was overruled, and then an answer was filed by the defendant, and proof heard. The result was a decree was pronounced by the chancellor in accordance with the prayer of the bill, qualified, however, by a clause that nothing in the decree should be construed to in any way affect or apply to defendant's interstate commerce, or to prohibit it from engaging in interstate commerce within this State.

There was a supplemental bill filed, which was demurred to by the defendant, and the demurrer sustained.

From the decree sustaining the original bill and grant-
ing relief thereon, the defendant appealed to this court,
and has here assigned errors; and from the decree sus-
taining the demurrer to the supplemental bill the State
has appealed to this court and assigned errors.

In the view which we take of this case, we need not
further advert to the supplemental bill, or the action of
the chancellor thereon.

Inasmuch as some of the defenses interposed, both of
law and fact, depend upon criticisms made upon the
language and scope of the bill, it is proper that the
pleading be set out substantially in full.

Omitting the caption, it reads as follows:

"Complainant respectfully show unto your honor:

"That the defendant, Standard Oil Company, is a cor-
poration originally chartered and organized under the
laws of the State of Kentucky, and since 1893 has been
claiming the right to do, and has been doing, business
in the State of Tennessee, after having filed a copy of
its charter in the office of the secretary of state of
complainant, State of Tennessee, on September 21, 1893.
A duly certified copy thereof is herewith filed as Exhibit
A to this bill, but need not be copied in issuing process.
Said defendant was at the time of the matters hereinaf-
ter shown, and still is, doing business in Sumner county,
Tennessee, and has a local agent residing at, in, or near
the town of Gallatin, in said Sumner county.

"Complainant further shows and avers that in 1903,
the defendant, Standard Oil Company (for convenience

hereinafter referred to as defendant company), was engaged in and carrying on the business in Sumner county, and in Tennessee generally, of a dealer in coal oil and other products of petroleum, which were and are commonly used for illuminating and other purposes, which it sold both to retail dealers and the public generally. The business of defendant company in the greater part of Tennessee, including Sumner county, was under the management and control of one J. E. Comer, whose headquarters or offices were at Nashville, in Davidson county, Tennessee, and the local agent having in charge the business of said company at or near Gallatin, Tennessee, was one O'Donnell Rutherford, and there was also employed in and about the business of defendant company one C. E. Holt, who was styled a 'salesman,' but who had charge, under the general supervision of said Comer, of the local agents and agencies of said company, inspecting the same and giving directions and instructions thereto. The said Comer, as special or managing agent, and the said Holt, acting under him, were authorized by defendant company to do, and in fact did, whatever in their judgment was necessary to advance the interests of their employer.

"Complainant further shows that the oil for illuminating and other purposes, handled, sold, and dealt in within the State of Tennessee, was imported and brought into said State from other States, and then stored in large iron tanks located at places where defendant company established local agencies, and from said tanks, usually

called 'storage tanks,' said oils were offered for sale and sold to retail dealers, and oftentimes to the public generally. Defendant company had one of its storage tanks located at Gallatin, and from this tank it supplied the demand for oil in Gallatin and at other places in Sumner county.

"Complainant further shows and avers that prior to October, 1903, defendant company had succeeded in preempting and securing for itself the oil business in Sumner county, and had succeeded in preventing other dealers in coming in competition with its said business in Sumner county, and at said time, to wit, in October 1903, was engaged in selling in Sumner county an inferior grade of oil at the price of 13½ cents per gallon.

"Complainant further shows that thus matters stood in relation to the oil business carried on by defendant company at Gallatin when, on or about October 5, 1903, one Claude Rosemon, an agent or traveling salesman of the Evansville Oil Company, whose chief office was at Evansville, in the State of Indiana, and which was engaged in the business of selling, among other things, illuminating oils, went to Gallatin, in Sumner county, Tennessee, and offered for sale to certain retail dealers at that place a superior grade of oil in competition with the oil of defendant company then stored in its tanks at Gallatin, or which was being offered for sale at that place, and the said Rosemon succeeded in securing from certain customers of defendant company orders for

about sixty barrels of oil at the price of 14½ cents per gallon, to be shipped from Oil City, Pennsylvania, and delivered in original packages to said persons giving said orders about November 1, 1903. Among others, said Rosemon secured an order from one S. W. Love for ten barrels of oil, from one W. H. Lane an order for five barrels of oil, from one J. E. Cron an order for ten barrels of oil and from one L. C. Hunter an order for six barrels of oil.

"Thereupon, information having come to defendant company that said Evansville Oil Company had secured orders for it from, and sold oil to, its customers at Gallatin, as hereinbefore shown, and was thereby and in that manner competing with the oil business of defendant company at Gallatin, the said defendant company and its said agents, J. E. Comer, C. E. Holt, and O'Donnell Rutherford, and the said S. W. Love, W. H. Lane, J. E. Cron, and L. C. Hunter, and perhaps others unknown to complainant, unlawfully made and entered into an arrangement, agreement, and combination, with a view to lessen, and which tended to lessen, full and free competition in the sale of defendant company's oil then being sold or offered for sale at Gallatin, and the said defendant company and its said agents, Comer, Holt, and Rutherford, and the said S. W. Love, W. H. Lane, J. E. Cron, and L. C. Hunter, and perhaps others unknown to complainant, entered into and made certain unlawful arrangements, agreements, or combinations, which were designed to advance, and which tended to

advance, the price or cost to the purchaser or consumer of defendant company's said oil then being sold or offered for sale at Gallatin as aforesaid.

"And complainant further shows unto your honor that in order to carry said unlawful arrangements, agreements, or combinations into effect, and as a part of such unlawful agreements, arrangements, or combinations, the said defendant company and its agent, C. E. Holt, induced the said S. W. Love, W. H. Lane, J. E. Cron, and L. C. Hunter to rescind and cancel their several purchases of oil or orders for oil from said Evansville Oil Company, and as a consideration or inducement for said rescissions or cancellations, and as a part of said unlawful arrangements, agreements, or combinations, said defendant company gave without cost or charge to the said S. W. Love one hundred gallons of oil, and to the said W. H. Lane fifty gallons of oil; to the said J. E. Cron one hundred gallons of oil, and to the said L. C. Hunter fifty gallons of oil; and at its own expense sent telegrams, in the name of said Love, Lane, Cron, and Hunter, to said Evansville Oil Company, cancelling the orders of said parties.

"Complainant further shows unto your honor that the said Love and others named above, not only rescinded and canceled, in the manner and as above shown, their several orders given to the Evansville Oil Company as aforesaid, but that they refused to accept or receive said oil when the same was shipped to Gallatin, so that the

said Evansville Oil Company was driven from the field as a competitor with defendant company in the oil busi-- ness at Gallatin; and thereupon defendant company, having succeeded by means of and through the aforesaid unlawful agreements, arrangements and combinations in not only lessening, but destroying, full and free competition in the sale of its oil then stored at Gallatin and being offered for sale, immediately advanced the price of its oil, which was of inferior grade, as hereinbefore shown, from $13\frac{1}{2}$ cents per gallon to $14\frac{1}{2}$ cents per gallon, the price at which the said Evansville Oil Company had offered for sale and had sold a grade of oil far superior, as complainant is informed and believes, to the oil sold by defendant company.

"So that complainant avers and charges that the unlawful arrangements, agreements, or combinations made and entered into between the defendant company and its said agents, Comer, Holt, and Rutherford, and the said Love, Lane, Cron, and Hunter, as hereinbefore shown, were not only made with a view of lessening full and free competition in the sale of defendant's oil at Gallatin, but that in fact said unlawful arrangements, agreements, or combinations naturally tended to and did result in lessening and destroying full and free competition in defendant company's said oil at Gallatin, and naturally tended to and did result in advancing the price or cost of said oil to defendant's customers and the consumers of said oil in and about Gallatin, and in Sumner county, Tennessee.

"Therefore complainant charges that defendant company, a foreign corporation as aforesaid, has in the manner hereinbefore set out violated the provisions of section 1 of chapter 140 of the Acts of the general assembly of 1903, and this bill is brought by the complainant, through her attorney-general as aforesaid, in order that the punishment of such violations prescribed by section 2 of said act may be imposed upon said defendant company, to wit, that said defendant company be denied the right to do, and be prohibited from doing, business in this State.

"The premises considered, complainant prays:

"First. That the said Standard Oil Company may be made a party defendant to this cause, according to the practice of this honorable court, that is, by due service of subpoena; and that it may be required to answer the allegations of this bill fully and truly, but its answer under oath, or the equivalent of an oath, is hereby expressly waived.

"Second. For a decree enforcing the provisions of chapter 140 of the Acts of 1903, and particularly section 2 of said act, against said defendant company, to the end that it be denied the right to do, and be prohibited and ousted from doing, business within this State, and, to the end that such decree may be made effectual, its permit or license to do business in this State be canceled; that the said defendant company, its officers, agents, employees, and all persons acting for it, may be per-

petually enjoined from doing or carrying on its business in this State.

"Third. For all such interlocutory orders and decrees as may from time to time become necessary in the progress of this cause, in order to attain the ultimate relief hereinbefore prayed, including, if it shall be necessary, an order restraining, *pendente lite,* the defendant company from carrying on and doing business in this State.

"Fourth. And if in any way complainant is mistaken in its special prayers, it prays for all such other further and general relief as in equity it may be entitled to.

"Fifth. This is the first application for an injunction or extraordinary process in this cause."

The demurrer filed to the bill stated the grounds of objection thereto as follows:

"First. That the said bill nowhere states the terms or provisions of the agreement, arrangement, or combination alleged to have been entered into and made, as the law requires to be done in order to oblige this defendant to answer.

"Second. The bill fails to show an arrangement, agreement, or combination in violation of any act or law of the State of Tennessee, and not an act, if a violation of law at all, in violation of the laws of the United States relating to interstate commerce."

On this demurrer being overruled, the defendant answered the bill, and in this answer, after admitting its incorporation and organization, as stated in the bill, and that it was doing business in Sumner county, and deny-

ing that it had done the things complained of in the bill, then proceeded to set up a variety of defenses, all of which are so fully stated in the assignments of error that they need not be referred to more specifically at this point.

The statute on which the controversy is based, omitting the caption, reads as follows:

"Section 1.   Be it enacted by the general assembly of the State of Tennessee, and it is hereby enacted by the authority of the same, that from and after the passage of this act all arrangements, contracts, agreements, trusts or combinations between persons or corporations made with a view to lessen, or which tend to lessen full and free competition in the importation or sale of articles imported into this State, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts or combinations between persons or corporations designed, or which tend to advance, reduce or control the price or the cost to the producer or the consumer of any such product or article, are hereby declared to be against public policy, unlawful and void.

"Sec. 2.   Be it further enacted, that any corporation chartered under the laws of the State which shall violate any of the provisions of this act shall thereby forfeit its charter and its franchise and its corporate existence shall thereupon cease and determine.   Every foreign corporation which shall violate any of the provisions of this act is hereby denied the right to do, and is prohibited

from doing business in this State. It is hereby made the duty of the attorney-general of this State to enforce these provisions by due process of law.

"Sec. 3. Be it further enacted, that any violation of the provisions of this act shall be deemed, and is hereby declared to be destructive of full and free competition and a conspiracy against trade, and any person or persons who may engage in any such conspiracy or who shall, as principal manager, director or agent, or in any other capacity, knowingly carry out any of the stipulations, purposes, prices, rates or orders made in furtherance of such conspiracy, shall upon conviction be punished by a fine of not less than one hundred dollars or more than five thousand dollars, and by imprisonment in the penitentiary not less than one year nor more than ten years; or in the judgment of the court, by either such fine or imprisonment.

"Sec. 4. Be it further enacted, that any person or persons or corporation that may be injured or damaged by any such arrangement, contract, agreement, trust or combination, described in section 1 of this act, may sue for and recover in any court of competent jurisdiction in this State of any person or persons or corporation operating such trusts or combination, the full consideration or sum paid by him or them of any goods, wares, merchandise or articles, the sale of which is controlled by such combination or trust.

"Sec. 5. Be it further enacted, that it shall be the duty of the judges of the circuit and criminal courts of

State v. Standard Oil Co.

this State specially to instruct grand juries as to the provisions of this act.

"Sec. 6. Be it further enacted, that all laws and parts of laws in conflict with the provisions of this act be and the same are hereby repealed.

"Sec. 7. Be it further enacted, that this act take effect from and after its passage, the public welfare requiring it.

"Passed March 16, 1903."

There are twenty errors assigned. We shall not set them out at this point, but shall state them as they are severally disposed of, and shall dispose of them, not in the order in which they are set forth in the brief, but in what shall seem to us the most convenient order.

We shall first take up the demurrer.

The first ground is in substance that the bill does not state the terms of the agreement, arrangement, or combination alleged to have been entered into.

The terms of the agreement, arrangement, or combination, while not stated with precision in the bill, appear therein with sufficient fullness and accuracy to justify the requirement of an answer on the part of the defendant.

It appears from the bill that the defendant was, at the time of the matters complained of, doing business in Sumner county, this State, and engaged in the sale of oil; that this business was under the management of one J. E. Comer, whose headquarters were at Nashville, Davidson county; that the local agent in charge at Gal-

latin was O'Donnell Rutherford, and that one Holt, who was styled a "salesman," had charge, under the general supervision of said Comer, of the local agents and agencies of the defendant, inspecting them and giving directions and instructions to them; that Comer, and Holt acting under him, were authorized by the defendant to do, and in fact did, whatever in their judgment was necessary to advance the interests of their employer; that the oil which defendant dealt in was imported into the State from other States, and then stored in large iron tanks at places where the defendant established local agencies, and from these tanks, usually called "storage tanks," oils were offered for sale, and were sold to retail dealers, and oftentimes to the public generally; that one of the storage tanks was located at Gallatin, and from this tank the defendant supplied the oil at Gallatin and at other places in Sumner county; that prior to October, 1903, the defendant had practically secured a monopoly of the sales of oil in Sumner county, and on the date mentioned was engaged in selling oil there of inferior grade at the price of $13\frac{1}{2}$ cents per gallon.

After having thus outlined the situation of affairs at the date when the occurrence happened which is the subject of the complaint contained in the bill, it then set forth the occasion of entering into the "agreement, arrangement, or combination" complained of. This was that about October 5th one Claude Rosemon, an agent or traveling salesman of the Evansville Oil Company,

whose chief office was at Evansville, in the State of Indiana, and which was engaged in the business of selling oil, went to Gallatin, in Sumner county, and offered for sale to certain retail dealers a superior grade of oil in competition with the oil of the defendant company then stored in its tanks at Gallatin, or which was being offered for sale at that place, and that Rosemon succeeded in securing from certain customers of the defendant company orders for about sixty barrels of oil at the price of 14½ cents per gallon to be shipped from Oil City, Pa., and delivered in original packages to said persons, about November 1, 1903; that, among others, Rosemon secured an order from S. W. Love for ten barrels, another order from W. H. Lane for five barrels, and still another from J. E. Cron for ten barrels, and another from L. C. Hunter for six barrels.

It is alleged that, information having come to defendant company that the Evansville Oil Company had secured these orders from its customers at Gallatin and was thereby competing with the defendant's oil business, the defendant and its agents, Comer, Holt, O'Donnell Rutherford, and the said purchasers from the Evansville Oil Company, entered into the "agreement, arrangement, or combination" complained of. It is stated that as a part of the agreement, arrangement, or combination the defendant company and its agent, Holt, induced the purchasers named to rescind and cancel their several purchases of oil, or orders, from the Evansville Company. It is also stated that as a consideration or induce-

ment for said rescissions or cancellations, and as a part of the unlawful arrangements, agreements, or combinations, the defendant company gave, without cost or charge, to S. W. Love one hundred gallons of oil, to W. H. Lane fifty gallons, to J. E. Cron one hundred gallons, and to L. C. Hunter fifty gallons of oil, and at its own expense sent telegrams to the parties named to the Evansville Oil Company canceling the orders of the parties.

In the paragraph of the bill immediately preceding what we have just stated the arrangement, agreement, or combination described in respect of its purpose or tendency as being "with a view to lessen, and tending to lessen, full and free competition in the sale of defendant company's oil then being sold or offered for sale at Gallatin," and further on in the same paragraph it is described as "designed to advance, and tending to advance, the price or cost to the purchaser or consumer of defendant company's oil then being sold or offered for sale at Gallatin."

In a subsequent paragraph it is stated that the purchasers named, that is, Love and others, actually rescinded and canceled the orders above mentioned, and refused to accept the oil when it was shipped to Gallatin; that thereby the Evansville Oil Company was driven from the field as a competitor, "and thereupon defendant company, having succeeded, by means of and through the aforesaid unlawful agreements, arrangements, and combinations, in not only lessening, but destroying, full and

free competition in the sale of its oil then stored at Gallatin and being offered for sale, immediately advanced the price of its oil, which was an inferior grade, as hereinbefore shown, from $13\frac{1}{2}$ cents per gallon to $14\frac{1}{2}$ cents per gallon, the price at which the said Evansville Oil Company had offered for sale and had sold a grade of oil far superior;  .  .  .   that the unlawful arrangements, agreements and combinations  .  .  .   were not only made with a view of lessening full and free competition in the sale of defendant's oil at Gallatin, but that in fact said unlawful arrangements, agreements, or combinations naturally tended to and did result in advancing the price or cost of said oil to defendant's customers and the consumers of said oil in and about Gallatin, and in Sumner county, Tennessee."

We do not think there is much difficulty in ascertaining from these allegations that the defendant and its agents, Comer and Holt, had entered into an agreement to procure the cancellation of the orders previously obtained by the Evansville Oil Company, with a view to lessening full and free competition in the sale of the defendant's oil then being sold or offered for sale at Gallatin, and that this agreement, arrangement, or combination tended to lessen such full and free competition; also that it was designed to advance and tended to advance the price to the purchasers or consumers of defendant's oil; that the purchasers from the Evansville Oil Company were induced to enter into this arrangement, and did enter into it by reason of the gift of certain

barrels of oil to them, respectively, and that the effect of the transaction was to enable the defendant to retain its monopoly of the sale of oil, and to keep and use the power to advance the price.

In Gibson's Suits in Chancery, section 63, it is said: "The court makes every reasonable presumption in favor of bills, when assailed by a demurrer or motion to dismiss"—citing Code, section 2884 (Shannon's Code, section 4605); *Thompson* v. *Paul*, 8 Humph., 117; *Lincoln* v. *Purcell*, 2 Head, 143, 73 Am. Dec., 196; *Hobbs* v. *Memphis & Charleston R. R. Co.*, 9 Heisk., 879; Id., 12 Heisk., 531; *French* v. *Dickey*, 3 Tenn. Ch., 302. The same author in section 371 says: "The courts make every reasonable presumption in favor of the bill, when assailed by a demurrer, and if upon a critical examination of the facts stated in the bill there is a possibility that the suit may be sustained, though upon a different ground from that assumed, a demurrer to the whole bill will be overruled; the policy of the courts being to give every complainant an opportunity to be heard on the merits of his case, when any equity whatever appears in his bill, although defectively stated"—citing in support of the text the authorities already referred to, and in addition thereto *Kerr* v. *Kerr*, 3 Lea, 224; *Trafford* v. *Wilkinson*, 3 Tenn. Ch., 449; and *Anderson* v. *Mullenix*, 5 Lea, 287. The authorities cited fully sustain the text as the rule obtaining in this State, although it is conceded in these authorities that a different rule applies in the English chancery practice.

It appears from the answer that the defendant had no difficulty in placing a similar construction upon the bill.

In paragraph 4 of the answer it is said:

"Respondent believes it to be true, and therefore admits, that its special agent, Mr. Comer, at Nashville, was informed in some way of the fact that Mr. Rosemon had visited Gallatin for the purpose of taking orders or making sales; but he did not know the success of Mr. Rosemon's visit—that is, whether he had placed any orders or not.

"C. E. Holt was a traveling salesman in the service of this company's Nashville agency, and about the 8th or 10th of October, 1903, Mr. Holt, who was then at Monterey, Tennessee, traveling for the company, was informed by Mr. Comer of the fact that said Rosemon had visited Gallatin; and he directed Mr. Holt to go to Gallatin and ascertain what had been done, for the purpose of looking after his trade, for the trade of Gallatin had been one of value to respondent, and it had put itself to great expense in establishing the stations, wagons, etc., to accommodate that trade. Mr. Comer did not authorize, or direct, or order, Mr. Holt to proceed to Gallatin and effect a countermand of the orders which the Gallatin merchants had given to Mr. Rosemon by gifts of oil, as charged in the bill; neither had any agent of the company authorized or directed him so to do. Respondent says that it had not been conducting business in that way in the State of Tennessee, and that it had

never done anything of the kind, or had its agent, Mr. Comer, ever directed anything of the kind in any part of Tennessee.

"Mr. Holt was a traveling salesman, with authority to look after the local agents—that is to say, see what they were doing, and to report; but he had no authority whatsoever to fix the price of oil, nor to sell it at any other price than that at which he was directed to sell it through the special agent, nor to give away oil, nor to control the local agents in any way.

"On or about the 12th day of October, 1902, Mr. Holt arrived at Gallatin, and upon inquiry ascertained that Mr. Rosemon, on his said visit to Gallatin, had taken orders from merchants of that place who were his regular customers, for the purchase and delivery of coal oil in barrels. He was informed that merchant S. W. Love had ordered ten barrels, merchant W. H. Lane had ordered five barrels, merchant J. E. Cron had ordered ten barrels and merchant L. C. Hunter had ordered five barrels.

"Respondent was not then, but is now, informed, and believes it to be true, that Mr. Holt approached these merchants to induce them to countermand the orders they had given to Mr. Rosemon, and to that end explained to them how they had been his customers; that the oil of this respondent was as good as Mr. Rosemon's; that it was of great advantage to them to buy from this respondent, by reason of the fact that they could buy in any quantity (over twenty gallons) and have it de-

livered from the wagons at their doors, and would not be obliged to keep it in wooden barrels and suffer leakage and loss, as would be in the case of the oil ordered from Mr. Rosemon. Respondent admits that Mr. Holt endeavored, by arguments of this kind, to induce them to countermand the orders which they had given. Respondent is now, but was not then, informed, and believes it to be true, that, not having succeeded with these arguments, he and the local agent, O'Donnell Rutherford, as an inducement, also offered and agreed to give them oil— that is to say, to give to Mr. Love and Mr. Cron (who had ordered ten barrels each) one hundred gallons of oil each, and to Mr. Hunter and Mr. Lane (who had ordered five barrels each) fifty gallons each, if they would countermand the said orders; and it admits that thereupon these merchants accepted these offers, and agreed to countermand them, and that they thereupon did telegraph immediately to the Evansville Oil Company, at Evansville, Ind., countermanding their orders. Said S. W. Love telegraphed as follows:

"'Kindly countermand my order for ten barrels of oil.　　　　　　　　　　S. W. Love.'

"The other countermanding orders were similar to this. . . .

"The fact that the said four orders had been procured to be countermanded by gifts of oil was concealed from this respondent company, and from its special agent, Mr. Comer, and was known only to the said Holt and the said Rutherford, mere subordinate employees, without

authority to make contracts for the company of any other kind than sales of oil at the prices fixed by or through the special agent at Nashville. The first knowledge that the respondent company had thereof came to its special agent, Mr. J. E. Comer, at Nashville, about the 23d day of December, 1903, from said Rutherford, and immediately he disapproved of the transaction, reprimanded said Rutherford and Holt, and deducted $40.50, the value of said oil, from the monthly salary of Mr. Rutherford, the local agent, who had delivered the three hundred gallons of oil to the said merchants, and in this way made him refund to the company and pay for the same. The managing officers of this company had no knowledge of these transactions until informed thereof by said Comer, and he had no knowledge thereof until December 23, 1903.

"Respondent has now stated fully and in detail the transactions which are attempted to be made an illegal and criminal agreement or combination by the bill filed in this cause.

"Respondent says there is no other foundation for the charge made against it in this bill, that the facts are as stated above, and that these are all the facts in the case."

We think the bill states a cause of action. The same transaction was examined by the court in what is known as *Holt's Case,* reported under the style of *"Standard Oil Co.* v. *State,"* in 117 Tenn., 618, 100 S. W., 705, 10 L. R. A. (N. S.), 1015.

We are referred to the case of *State* v. *Witherspoon,*

115 Tenn., 140, 90 S. W., 852, as an authority in sup-
port of the demurrer.   We think that an examination of
that case will disclose that the analogy sought to be
drawn between that case and the present does not hold.
The indictment in that case was that Ross Witherspoon
"did in Madison county, Tennessee, unlawfully, know-
ingly, and feloniously, as president, director, and agent
of the Southern Seating & Cabinet Company  . . .
carry out the stipulations, purposes, prices, rates, and
orders made by the said Southern Seating & Cabinet
Company with the American School Furniture Com-
pany, a foreign corporation, in furtherance of a con-
spiracy against trade, to wit, the said Southern Seating
& Cabinet Company and the said American School Fur-
niture Company having heretofore entered into, and
being then and there parties to, an arrangement, agree-
ment, trust, and combination, with a view to lessen, and
which tended to and did lessen, full and free competition
in the importation and sale of articles imported into the
State of Tennessee, and in the manufacture and sale of
articles of domestic growth and of domestic raw ma-
terial, and which tended to and did advance and control
the price and cost of such product and article to the
consumer and buyer thereof, against the peace and
dignity of the State."

The objection which the court found to the indictment
is thus stated in the opinion:

"It utterly fails to state the terms of the agreement or

120 Tenn—8

arrangement entered into by the parties, and the particular articles imported or of domestic manufacture or growth, the price of which such arrangement, agreement, and conspiracy tended to control and lessen or advance. The indictment would apply to imported articles as well as domestic articles, and to domestic manufactured articles equally with articles of raw material. It would apply equally to any one of the hundreds of articles of commerce which are imported into the State, or which are here manufactured or otherwise produced. It clearly, for these reasons, fails to give the defendant any notice of the nature of the charge brought against him, or of the particular crime with which he is accused and is held to answer, so that he could with intelligence prepare his defense. Nor is the crime charged so identified that the record in this case could be relied upon in another for the same offense upon the plea of former conviction or acquittal. The indictment should charge the particular article, whether imported or of domestic manufacture and growth, in relation to which the contract, arrangement, and agreement between the parties is made, and the effect of such arrangement upon the prices of such articles. Without a statement of these facts the defendant will be put to trial without presentment or indictment, and will be denied his constitutional right to know the nature and cause of the accusation against him."

Not to mention the difference between an indictment and a bill in chancery, it is clear that there is nothing

in the foregoing on which we could hold that there was a fatal defect in the bill similar to the defect noted in the *Witherspoon Case.*

The first ground of demurrer must therefore be overruled.

The second ground of demurrer presents the same subject which arises under the fourth, fifth, and twelfth assignments of error, and will be passed for the present.

We shall next consider together the sixth, ninth, tenth, and eleventh assignments of error, as they are rested substantially upon the same predicate; that is to say, that the agreement, arrangement, or combination which is the subject of the present litigation, if proven at all, was a crime, and should have been redressed by a criminal action.

The sixth assignment is that the chancellor erred "in not holding and decreeing that the present proceedings put the defendant to answer a criminal charge without indictment or presentment, or without being based upon a conviction upon a previous indictment or presentment, in violation of the constitution of Tennessee."

The ninth assignment is that the chancellor erred "in not holding and decreeing that the bill be dismissed for that the said act is unconstitutional and void, because (a) it arbitrarily and capriciously denies to the defendant, a foreign corporation, the right to a trial by jury for a violation of its provisions; (b) it arbitrarily, capriciously, and unreasonably denies to corporations charged with violating its provisions the right of trial

State v. Standard Oil Co.

by jury granted to natural persons charged with violating its provisions; (c) it arbitrarily, capriciously, and unreasonably denies to corporations charged with violating its provisions a trial according to the laws of the land for the trial of criminal charges, whereby the defense of the statute of limitations can be pleaded and relied upon, while it grants the same to natural persons charged with violating its provisions; (d) it arbitrarily, capriciously and unreasonably denies to corporations charged with violating its provisions a trial according to the procedure prescribed by the laws of the land for the trial of criminal charges, whereby the guilt of the party charged must be established beyond a reasonable doubt in order to convict, and obliges the corporation to answer and defend in a procedure whereby it may be convicted upon a mere preponderance of the evidence, or upon less evidence than such as is required to establish guilt beyond a reasonable doubt, when it grants to natural persons charged with its violation the right to be tried according to that procedure prescribed by the laws of the land under which the accused must be proven guilty beyond a reasonable doubt in order to convict."

The tenth assignment is that "the said act is null and void, for that it is in violation of the constitution of the United States, particularly the fourteenth amendment, in that it deprives the defendant of its liberty and property without due process of law. It deprives of its liberty and property without the process of law in each and every of the respects mentioned and stated under

error No. 9 hereinbefore, marked 'a,' 'b,' 'c,' and 'd,' and in error No. 6, and which are here referred to and made a part hereof the same as if here repeated again; and the court erred in not dismissing the bill accordingly."

The eleventh assignment is "that the said act is null and void, for that it is in violation of the constitution of the United States, particularly the fourteenth amendment, in that it deprives this defendant, a person within its jurisdiction, of the equal protection of the laws. It denies that equal protection in each and every of the respects mentioned and stated under error No. 9 hereinbefore, marked 'a,' 'b,' 'c,' and 'd,' and in error No. 6, and which are here referred to and made a part hereof the same as if here repeated again, and in not dismissing the bill accordingly."

In disposing of these assignments it is necessary that we should make a brief review of the methods pursued at common law in forfeiting the charters of corporations and those pursued in this State.

In a note to *People* v. *Rensselaer, etc., R. Co.,* 30 Am. Dec., 45, Mr. Freeman says:

"The writ of *quo warranto,* having its origin at some unascertained period early in the history of the common law, was a high prerogative writ, in the nature of a writ of right, for the king against one who usurped or claimed any office, franchise, or liberty of the crown, to inquire by what authority he supported his claim, in order to determine the right. It also issued in cases of the misuser or nonuser of a franchise, commanding the respond-

ent to show by what right—quo warranto—he exercised the franchise, having never had any grant of it, or having forfeited it by neglect or abuse. 3 Black., Com., 262-264; High on Extr. Rem., section 592. If the respondent could not establish his right, the franchise or office, as it might be, was forfeited to the crown. As many of the charters under which the franchises were claimed had been destroyed in the numerous insurrections under which the country suffered, or had been otherwise lost, sufficient authority for the exercise of the royal grants could not, in very many instances, be shown; and the crown became enriched at the expense of its subjects. The writ was especially calculated to subserve the purposes of a grasping monarch, as the right of the respondent to his office, liberty, or franchise was heard before commissioners of the king's own appointing. To correct the abuse of the royal prerogative, and to afford some opportunity for a fair and convenient hearing, the statutes of Gloucester (St. 6 Edw. I, c. 1278) and *de quo warranto novum* (St. 18 Edw. I, c. 1290) were passed. These statutes secured the right of a trial before the justices on their circuits, and confirmed those franchises resting in prescription, or claimed under charters granted within the time of Richard I, or granted prior thereto but since allowed."

In the same learned note Mr. Freeman thus notes the rise of the information in the nature of *quo warranto*:

"This writ was of a civil nature, forfeiting or annulling some franchise, or ousting the respondent from its

exercise; and, being a writ of right, it was conclusive upon the crown. These features of the proceeding, together with the reason that, with the discontinuance of justices in eyre (2 Coke, Inst., 498), St. 18 Edw. I, lost its efficacy, led to the introduction of the speedier remedy, and one not so binding upon the crown, of informations in the nature of *quo warranto*. This remedy was criminal in its nature, and not only forfeited the usurped or misused franchise to the crown, but also punished the usurper. Like the original writ of *quo warranto,* the precise date of the appearance of this information is unknown. It grew up side by side with the older writ, and gradually supplanted it. It was a criminal proceeding, and warranted the imposition of a fine for the usurping of the king's liberties; but the fine fell to a nominal amount, and the information existed merely as substitution for the original *quo warranto*. Thus far the contest in respect to a given franchise was carried on under the writ of *quo warranto,* or information in the nature thereof, between the crown and its subjects only. The province of the information was, however, greatly enlarged by St. 9 Anne, 20, in the year 1711, which gave to private individuals the power of proceeding thereunder against any one who had unlawfully usurped or intruded into any office or franchise. This act, one of vast importance, is preserved in substance in the majority of the States of the Union."

The statute referred to provided "that from and after the said first day of Trinity term, in case any person or

persons shall usurp, intrude into, or unlawfully hold and execute any of the said offices, or franchises, it shall and may be lawful to and for the proper officer, in each of the said respective courts, with the leave of the courts respectively, to exhibit one or more information or informations in the nature of a *quo warranto,* at the relation of any person or persons desiring to sue or prosecute the same, and who shall be mentioned in such information or informations to be the relator or relators against such person or persons so usurping, intruding into, or unlawfully holding and executing any of the said offices or franchises, and to proceed therein in such manner as is usual in cases of information in the nature of a *quo warranto;* and if it shall appear to the said respective courts, that the several rights of divers persons to the said offices or franchises may properly be determined on one information, it shall and may be lawful for the said respective courts to give leave to exhibit one such information against several persons, in order to try their respective rights to such offices or franchises; and such person or persons, against whom such information or informations in the nature of a *quo warranto* shall be sued or prosecuted, shall appear and plead as of the same term or sessions in which the said information or informations shall be filed, unless the court where such information shall be filed shall give further time to such person or persons against whom such information shall be exhibited, to plead; and such person or persons who shall sue or prosecute such information

or informations in the nature of a *quo warranto,* shall proceed thereupon with the most convenient speed that may be; any law or usage to the contrary thereof in any wise notwithstanding."

Mr. Thompson, in his work on Corporations (volume 5, section 6770), says:

"The writ of *quo warranto* and the information in the nature of *quo warranto* have been used against corporations and against persons claiming corporate franchises from the earliest times.     The ancient theory of the remedy was that a franchise is a portion of the royal prerogative, granted to the subject and existing in his hands, and that to misuse or usurp this delegated right is an infringement upon the rights of the sovereign; and accordingly, as elsewhere seen, the form of the judgment anciently was that the franchise be seized into the king's hands.     In the United States the sovereign power resides in the State, the commonwealth, or the people, according to various theories, and the information in such a case proceeds on the same theory.     The theory is that 'it is a tacit condition of a grant of incorporation that the grantees shall act up to the end or design for which they were incorporated; and hence, through neglect or abuse of its franchises, a corporation may forfeit its charter as for condition broken, or for a breach of trust,' and that, 'where there has been a misuser or a nonuser in regard to matters which are of the essence of the contract between the corporation and the State, and the

acts or omissions complained of have been repeated and willful, they constitute a just ground of forfeiture.' "

In a note to *Buckman* v. *State of Florida,* in respect of jury trials in this class of cases, it is said:

"The practice has been almost universal to submit the questions of fact arising in *quo warranto* proceedings to a jury, as will be seen by the authorities cited in the above case and those collected in the case of *Reynolds* v. *State,* 61 Ind., 392; but the cases in which the question of the right to such trial has been adjudicated are very few. There are many early English cases, decided before the passage of St. 3 Geo. II, c. 25, in which the aid of a jury was obtained in trying questions arising in *quo warranto* proceedings; but there seems to be no expression as to the right to have the questions submitted to the jury. The early practice books are equally silent on the subject. After the passage of St. 3 Geo. II, c. 25, which provides for a jury in such cases, decisions may be found to the effect that such questions must be submitted to a jury; but even then it is not stated whether such ruling is based upon the statute or upon prior existing law or practice. In *Nevill* v. *Payne,* 1 Cro. Eliz., 304 (35 & 36 Eliz.), a jury trial was had. In a case decided in 10 Geo. I, where the right to the office depended on the qualification of the electors, the court made the rule absolute, on the ground that, being a matter of right, it was fit to be tried by a jury; they being the proper judges of evidence. *King* v. *Whitchurch,* 8 Mod., 210. In a case decided in 1731 (5 Geo. II), a rule was granted to

show cause why an information in the nature of *quo warranto* should not go against defendant for exercising the office of capital burgess of the town of New Radnor, and his counsel asked the court to determine the point on the rule for showing cause, and not put defendant to the expense of a special verdict; but the court made the rule absolute, thinking this a matter fit to be determined in a more solemn way: *King* v. *Pool*, 2 Barnard, 93, note. In *King* v. *Clarke*, 1 East, 38, the court said: 'The question is put too much *in dubio* by the affidavits by either side for the court to say that it is not proper to be inquired into by a jury.' And similar remarks were made in *King* v. *Bingham*, 2 East, 308. In *King* v. *Bridge*, 1 W. Bl., 46 (23 Geo. II), it is said that the case must be tried by jury. In *King* v. *Harwood*, 2 East, 177, it was admitted by defendant that the merits of the election must be submitted to a jury. The present English practice under the crown office rules is stated by Shortt on Mandamus, p. 189, to be that either party may obtain a trial with a jury on application for it; otherwise, the mode of trial will be by a judge without a jury. But the court may at any time order the trial to be before a jury. In this country the courts which have passed upon the question have not agreed as to whether the right to a jury was a common-law right, which was preserved by the constitutions. A very few of the States are in the same condition as Florida, in which all statutes passed in England prior to July 4, 1776, are in force. See note to *McKennon* v. *Winn*, 22 L. R. A., 508. Of course, in

such States there can be no question, because it is settled by St. 3 Geo. II, c. 25." 24 L. R. A., 806.

It is said not to be a constitutional right in *State* v. *Johnson,* 26 Ark., 281; *Wheat* v. *Smith,* 50 Ark., 266, 7 S. W., 161; *State* v. *Minnesota Thresher Mfg. Co.,* 40 Minn., 213, 41 N. W., 1020, 3 L. R. A., 510; *State* v. *Vail,* 53 Mo., 97; *State* v. *Lupton,* 64 Mo., 415, 27 Am. Rep., 253. In *State* v. *Burnett,* 2 Ala., 140, *People* v. *Doesburg,* 16 Mich., 133, *and People* v. *Albany & S. R. Co.,* 57 N. Y., 161, it seems to be held that a jury trial is a matter of right, and in *State* v. *Allen,* 5 Kan., 213, it is said that the parties were probably entitled to a jury trial. In *Com.* v. *Delaware & H. Canal Co.,* 43 Pa., 295, it was said that it was a matter of no importance to the parties whether the authority granted to the courts by the *quo warranto* acts in that State was exercised in the common-law form, or in equity form, so long as the right of trial by jury was preserved.

When the information in the nature of *quo warranto* began to be used in this country, and the question arose as to whether the action was of a civil or criminal nature, it arose on the very point made in the sixth assignment of error set out supra.

In the case of *State* v. *Hardie,* which was an information in the nature of a *quo warranto,* filed by the solicitors for the State against Hardie for usurping the office of sheriff, the court said, in an opinion by Gaston, J.:

"It is objected, in the first place, that an information of the kind before us is utterly prohibited by the eighth

section of our Bill of Rights, which declares that 'no freeman shall be put to answer any criminal charge but by indictment, presentment, or impeachment.' The inquiry is whether the information in question be, within the meaning of the Bill of Rights, a 'criminal charge.' In every well-regulated government there must be some mode by which to put down the usurpation by unauthorized individuals of public power. In the country of our ancestors, and in ancient times, when any of the offices or franchises appertaining to sovereignty, and therefore called royal, were supposed to be held or exercised without lawful authority, the remedy was by suing out the writ of *quo warranto,* to inquire by what warrant the supposed usurper supported his claim, in order to determine the right thereto. This was said to be in the nature of a writ of right for the king, and, from what we have seen of the pleadings in it, bore little or no resemblance to a criminal prosecution. See Rastell's Entries, 'Quo Warranto.' Indeed Mr. Justice Wilmot, in *Rex* v. *Marsden,* 3 Burr., 1817, declares positively that it is not a criminal prosecution, but a civil writ at the suit of the crown, though Chancellor Kent, in *People* v. *Utica Insurance Co.,* 2 Johns. Cas., 117, speaks of it as a criminal proceeding. Be this as it may, the remedy certainly much resembled, if in truth it were not, a real action, and, like other actions of that family, was subjected in its prosecution to inconvenient delays. On this account, like most real actions, in process of time it became much disused, and its place was supplied by the

State v. Standard Oil Co.

information in the nature of a *quo warranto*. Originally this was a criminal proceeding. In it the usurpation was charged as an offense, and the offender, upon conviction, was liable to be punished by fine and imprisonment. Such, however, were the conveniences attending the information, as a mode of trying the mere question of right to the office or franchise, that, although it never entirely lost its form as a criminal proceeding, it was so modeled as to become substantially a civil action. A fine, indeed, was imposed upon conviction; but it was nominal only, no real punishment was inflicted, and it became, before our revolution, the general civil remedy for asserting and trying the right, in order to seize the office or franchise or to oust the wrongful possessor. See 3 Blk., Com., 262, 263; *Rex* v. *Francis*, 2 Term, 484; *Commonwealth* v. *Browne*, 1 Serg. & R. (Pa.), 385; *People* v. *Utica Insurance Co.*, 15 Johns. (N. Y.), 386, 8 Am. Dec., 243.

"Besides this peculiar information, well known as 'the information in nature of a *quo warranto*,' there was a mode of prosecution for the punishment of crimes by 'information.' This was, by a suggestion or charge, drawn up in form, and filed on record by the king's attorney-general, or by his coroner, or master of the crown office, in the court of king's bench, and was deemed sufficient, in every case not capital, to call every man to answer for the offense therein charged. There could be no doubt but this mode of criminal prosecution was as ancient as the common law itself; but the tyrannous

use made of it in high prerogative times, especially after jurisdiction of criminal prosecutions by information was extended to other tribunals than the court of king's bench, justly subjected it to the reprobation of the friends to freedom. The framers of our bill of rights were not schoolmen dealing in metaphysical abstractions, and busied about technical forms, but practical statesmen, guarding against real abuses of power, and securing the substantial rights of freemen. They intended to prohibit this mode of prosecution for crimes, and to throw around the object of penal visitation the protection either of a grand jury or of an inquiry by the impeaching body before he could be required to plead to a criminal accusation. Such is the purpose of the eighth section of the bill of rights; and accordingly we find it connected with a number of provisions from the seventh to the tenth, inclusively, in which are embodied the securities for a fair hearing, full defense, impartial trial, and the administration of justice in mercy to all sought to be convicted and punished because of public offenses. The proceeding before us is carried on *diverso intuitu,* and to hold it prohibited by the bill of rights would be to sacrifice substance to mere form. If, indeed, it should ever be attempted in informations of this character to impose a real fine, or to inflict any other punishment, so as to make them in effect criminal prosecutions, such attempts would fall before the explicit prohibitions of the section of the bill of rights now needlessly invoked." 23 N. C., 47-49.

The same point was raised in the same way in *State; ex rel. Dunlap* v. *Stewart,* 6 Houst. (Del.), 359, 375, 376. It is said in this case that "it is certain that an information in the nature of *quo warranto* had practically ceased to be treated in England, notwithstanding its form, as essentially a criminal proceeding, long before the enactment of the colonial statute of this State upon that subject."

In *Attorney-General* v. *Delaware, etc., R. Co.,* 38 N. J. Law, 282, 286, it is said:

"It was further suggested that the proceeding by information was in violation of the ninth paragraph of the first article of the constitution, to the effect that no person shall be held to answer for a criminal offense unless on the presentment or indictment of a grand jury. The old writ of *quo warranto* was clearly of a criminal nature, and the information, which for centuries past has served as its substitute, partook of the same character. The punishment inflicted under it was often of substantial consequence. But even in Blackstone's time it had 'long been applied to the mere purpose of trying the civil right, seizing the franchise, or ousting the wrongful possessor; the fine being nominal only' (3 Blackst., 263) and was then usually considered as merely a civil proceeding (4 Blackst., 312). After verdict for the defendant in such informations, a new trial may be granted. *Rex* v. *Francis,* 2 T. R., 484. The suggestion has not before been made since the adoption

of the constitution in 1844, or, if made, it has been disregarded, and cannot now prevail."

To the same effect, see *State, ex rel. Attorney-General,* v. *Vail,* 53 Mo., 97, 107.

In *Respublica* v. *Wray,* 3 Dall (Pa.), 490, 1 L. Ed., 692 (1799), it is said:

"The present is the first instance that we recollect of an application of this kind in Pennsylvania; and in opening the case it struck us to be within the tenth section of the ninth article of the constitution, which declares 'that no person shall, for any indictable offense, be proceeded against criminally by information,' except in cases that are not involved in the present motion. But, on consideration, it is evident that the constitution refers to informations as a form of prosecution to punish an offender without the intervention of a grand jury; whereas an information in the nature of a writ of *quo warranto* is applied to the mere purposes of trying a civil right and ousting the wrongful possessor of an office."

To the same effect is *Com.* v. *Commissioners of the County of Philadelphia,* 1 Serg. & R., 382, 385 (1815).

The foregoing cases are brought into a stronger light by the case of *Donnelly* v. *People,* 11 Ill., 552, 52 Am. Dec., 459, in which it is held that an information in the nature of a *quo warranto* is a criminal proceeding, because the statute there provides that a fine shall be imposed.

It was said by this court in *State* v. *Turk,* Mart. & Y., 287, 293, that neither the old writ of *quo warranto* nor the information in the nature of a writ of *quo warranto* had ever been adopted in Tennessee.

It is true that a different opinion was intimated in the subsequent case of *Bradley* v. *Commissioners,* 2 Humph., 427, 433, 37 Am. Dec., 563.

In the subsequent case of *State* v. *Merchants' Insurance & Trust Co.,* 8 Humph., 235, the information was that the *quo warranto* or information in the nature of *quo warranto* still existed in this State, but was regulated by chapter 55, p. 107, of the Acts of 1845-46, which made it the duty of the attorney-general to provide a bill in equity in the chancery court or circuit court to obtain relief against the abuses of corporations in the way of forfeiting their charters, or restraining their improper exercise of powers, or the assumption of powers not granted them by law.

In the case of *Attorney-General* v. *Leaf,* 9 Humph., 753, however, it was distinctly held, affirming the case of *State* v. *Turk,* supra, that neither the writ of *quo warranto* nor the information in the nature thereof was ever in force in this State.

In *State* v. *Scott,* 2 Swan, 332, the court applied Acts 1835-36, p. 163, c. 54, which made it the duty of the attorney-general to cause to be issued *scire facias* in the name of the State against turnpike companies that should offend in certain particulars, requiring them

State v. Standard Oil Co.

to appear and show cause why their charters should not be forfeited.

In *State* v. *Columbia & Hampshire Turnpike Co.*, 2 Sneed, 254, the same act was applied.

*Johnson* v. *Churchwell*, 1 Head, 146, was based simply on a section of the charter of the special bank therein referred to.

We now come to the provisions of our Code. The caption of title 11 of the Code is "Of Special Actions and Proceedings." The caption of chapter 8 thereunder is "Of Proceedings in the Name of the State against Corporations, and to Prevent the Usurpation of Office." This chapter embraces sections 5165 to 5187, inclusive, of Shannon's Code, and sections 3409 to 3431, inclusive, of the Code of 1858.

Section 5165 reads:

"An action lies, under the provisions of this chapter, in the name of the State, against the persons or corporations offending, in the following cases: . . . (3) When any person acts as a corporation within this State, without being authorized by law; (4) or if, being incorporated, they do or omit acts which amount to a surrender or forfeiture of their rights and privileges as a corporation; (5) or exercise powers not conferred by law; (6) or fail to exercise powers conferred by law and essential to the corporate existence."

In section 5167 it is provided:

"The suit is brought by bill in equity, filed either in the circuit or chancery court of the county or district

in which  .  .  ., the corporation, or supposed corporation, holds its meetings, or has its principal place of business."

Section 5168:    "The suit is brought by the attorney-general for the district or county, when directed so to do by the general assembly, or by the governor and attorney-general of the State concurring."

Section 5169:    "It is also brought on the information of any person, upon such person giving security for the costs of the proceedings, to be approved by the clerk of the court in which the bill is filed."

Section 5171:    "The bill will set forth briefly, and without technical forms, the grounds upon which the suit is instituted, and the suit will be conducted as other suits in equity."

Section 5172:    "Such issues of fact as may become necessary to try by jury in the progress of the cause, will be made up under the direction of the court, and submitted to a jury impaneled forthwith."

Section 5173:    "The court is authorized upon the filing of the bill, properly verified, in all proper cases, to grant attachments and injunctions, and appoint receivers to effect the ends of justice, and to make all such orders, rules, and decrees, according to the practice of a court of chancery, as may be necessary to accomplish the objects had in view."

Section 5180:    "When a defendant, whether a natural person or a corporation, is adjudged guilty of usurping, unlawfully holding, or exercising any office or fran-

chise, judgment shall be rendered that such defendant be excluded from the office or franchise, and that he pay the costs."

Section 5181: "If it be adjudged that a defendant corporation has, by neglect, nonuser, abuse, or surrender, forfeited its corporate rights, judgment will be rendered that the defendant be altogether excluded from such rights and be dissolved; and also that the corporation, its directors or managers, as the case may be, pay the costs."

This chapter of the Code was drawn almost entirely from chapter 55, p. 107, of the Acts of 1845-46, above referred to.

With reference to this chapter of the Code it was said by this court, in *State, ex rel.,* v. *M. J. Wright,* 10 Heisk., 237, 244, after referring to the ancient writ of *quo warranto,* and the information in the nature of *quo warranto,* and the English statutes upon that subject:

"These statutes made a great stride toward English liberty and the limitation of the royal prerogative; but the writs were issued under the sanction of courts of law, they were not prohibitory writs, and they still lacked the remedial vigor which has been superadded to our kindred remedy by ingrafting upon it the flexible and subtle attributes which belong to equity jurisprudence.    It is something more, then, than the ancient writ, and, whether initiated in a court of law or a court of equity, it is nevertheless made an 'equity proceeding,'

and carries along with it all the vast remedial incidents of a court of equity, by injunction and otherwise."

Other cases upon the same subject are *Hooper* v. *Rhea*, 3 Tenn. Cas., 145, 151, 152; *State* v. *Turnpike Co.*, 1 Tenn. Cas., 511; *State* v. *McConnell*, 3 Lea, 332, 335, 338; *State* v. *Campbell*, 8 Lea, 74, 76; *State* v. *Agee*, 105 Tenn., 588, 59 S. W., 340; *State, ex rel.*, v. *Turnpike Co.*, 112 Tenn., 615, 79 S. W., 798; *State, ex rel.*, v. *Telephone & Telegraph Co.*, 114 Tenn., 194, 86 S. W., 390.

We need not refer to, specially, any of the cases just mentioned, except *State* v. *McConnell* and *State* v. *Telephone & Telegraph Co.*

In *State* v. *McConnell*, after stating the fact that neither the ancient writ of *quo warranto* nor the information in the nature thereof was ever in force in this State, the opinion continued:

"Both the State and individuals were remitted to other remedies for the accomplishment of the ends aimed at by those proceedings. The legislature, from time to time, passed acts which were intended to answer, in particular instances, the same purposes. Some of these acts, with supplementary provisions, were brought forward into the Code. . . . The purposes for which the suit 'by bill in equity' is given by the sections of the Code referred to are those which were attained at common law by the writ of *quo warranto*, or by information in the nature thereof. In other words, the statute gives a new remedy for old wrongs. The settled rule in such case is to construe the law so as to

interfere as little as possible with the previous practice and the decisions of the courts on the subject of legislation."

In *State, ex rel.,* v. *Telephone & Telegraph Co.,* supra, the sections of the Code above referred to were applied to the case of a foreign corporation doing business in this State, for the purpose of ousting such corporation from the State.     Similar provisions in other States are applied in the same way.     6 Thompson on Corporations, sec. 7944—citing *State* v. *Boston, etc., R. Co.,* 25 Vt., 433; *State* v. *Fidelity, etc., Insurance Co.,* 39 Minn., 538, 41 N. W., 108; *State* v. *West. Union Mut. Life Ins. Co.,* 47 Ohio St., 167, 24 N. E., 392, 8 L. R. A., 129; *State* v. *Insurance Co.,* 49 Ohio St., 440, 31 N. E., 658, 16 L. R. A., 611, 34 Am. St. Rep., 573; *State* v. *Fidelity, etc., Insurance Co.,* 49 Ohio, 440, 31 N. E., 658, 16 L. R. A., 611, 34 Am. St. Rep., 573.

See, also, the following cases:     *State* v. *Fidelity & Casualty Insurance Co.,* 77 Iowa, 648, 42 N. W., 509; *State* v. *Standard Oil Co.,* 61 Neb., 28, 84 N. W., 413, 87 Am. St. Rep., 449; *State* v. *American R. R. Co.,* 65 Kan., 847, 69 Pac., 563.     And see *MacGinniss* v. *Boston & M. & Consol. Mining Co.,* 29 Mont., 463, 75 Pac., 1135; *Attorney-General* v. *Electric Storage B. Co.,* 188 Mass., 239, 74 N. E., 467.

This brings us to the act on which the present litigation is based.     Section 2 provides:     "That any corporation chartered under the laws of the State which shall violate any of the provisions of this act shall there-

by forfeit its charter, and its franchise, and its corpo-
rate existence shall thereupon cease and determine. Ev-
ery foreign corporation which shall violate any of the
provisions of this act is hereby denied the right to do,
and is prohibited from doing business in this State. It
is hereby made the duty of the attorney-general of this
State to enforce these provisions by due process of law."

It is clear that the last sentence in the section above
quoted had reference to the provisions of the Code which
we have referred to, and the recognized practice there-
under. Accordingly the attorney-general filed a bill in
the name of the State, "by and upon the relation of her
attorney-general."

We pause at this point to note that the proceeding
under which the defendant in the present case is brought
before the court is the same that applies to all domestic
corporations and to all foreign corporations, within the
borders of this State, and there is no other process of
law known to the practice of this State by which such a
litigation can be inaugurated or conducted. It is a
purely civil proceeding, and judgments eventuating
thereunder, to the effect that a corporation or corpora-
tions defendant thereto shall forfeit their charters, or be
ousted from the State, as the case may be, are civil
judgments, and not criminal sentences. Therefore the
provisions of our constitution referred to under the
sixth assignment ("that no person shall be put to an-
swer any criminal charge but by presentment, indictment
or impeachment"—article 1, sec. 14) do not apply. We

have seen from the cases cited from North Carolina, Pennsylvania, New Jersey, Delaware, and Missouri that similar provisions in the constitutions of those States are held not to apply, even under informations in the nature of a *quo warranto*.  This being a civil proceeding, the rule as to reasonable doubt would not apply, nor any other rule peculiarly applicable to criminal proceedings. The right of trial by a jury, the deprivation of which is complained of in the assignment of error, is preserved under section 5172 (3416) of the Code.    It is true that a jury is not permitted in cases of this kind to render a general verdict, as in ordinary cases at common law. Nor does it appear, as shown by reference to cases supra, that at common law juries had the right to render such general verdict, when impaneled under proceedings in the nature of a *quo warranto*.  But, however this may be, since that proceeding has never been in force in this State, and our Code provisions are entirely  new, though intended to serve the same purpose, we would not be bound by the rule at common law upon this subject, but would be at liberty to make such provisions in respect of a jury trial as the legislature might deem proper.    The practice, it is true, is assimilated as far as may be convenient to the old practice; but this does not apply to absolute rights inhering in the new process inaugurated by the Code.

The conclusion here announced was reached by the court in the case of *State, ex rel.,* v. *Schlitz Brewing Co.,* 104 Tenn., 715, 59 S. W., 1033, 78 Am. St. Rep., 941,

and perhaps we need not have gone further than to cite that case; but inasmuch as the authority of that case was attacked because the conclusion reached therein as to the constitutionality of the anti-trust act of 1897 had been disapproved by the supreme court of the United States in considering a similar Illinois statute in the case of *Connelly* v. *Union Sewer Pipe Co.,* 184 U. S., 554, 22 Sup. Ct., 431, 46 L. Ed., 679, and because the case had been inferentially disapproved in one other respect by this court, we concluded to again examine the question.    However, the authority of that case on the particular point which we now have under consideration is unshaken.    The act of 1897 which the court had under examination in that case was very similar to the act of 1903.    With the exception of its fourth section (which was similar to the objectionable clause in the Illinois act), it is substantially the same as the present act; and section 2 is the same as section 2 of the present act.    It was held in that case (104 Tenn., 748, 751, 59 S. W., 1033, 78 Am. St. Rep., 941) that it was not necessary that there should have been an antecedent conviction in a court of law, but that a bill in equity might be filed at once.

But it is insisted by the defendant that section 3 of the act of 1903 (chapter 140), supra, declares "that any violation of the provisions of this act shall be deemed, and is hereby declared to be destructive of full and free competition and a conspiracy against trade, and any person or persons who may engage in any such conspir-

State v. Standard Oil Co.

acy or who shall, as principal, manager, director or agent, or in any other capacity, knowingly carry out any of the stipulations, purposes, prices, rates or orders made in furtherance of such conspiracy, shall upon conviction be punished by a fine of not less than one hundred dollars or more than five thousand dollars, and by imprisonment in the penitentiary not less than one year nor more than ten years; or in the judgment of the court, by either such fine or imprisonment."

The argument is that, inasmuch as this section, just reproduced, declares the doing of the things referred to in section 1 a conspiracy against trade, and affixes a fine and imprisonment in the penitentiary, or either, as punishment, thereby putting persons in the category of criminals, and giving them the advantage of the rules of evidence and the presumptions applicable in criminal cases, also the benefit of the statute of limitations applicable to criminal cases, there is a discrimination against corporations, if they be not similarly treated; that is, proceeded against by indictment, and thereby be enabled to enjoy the benefit of the rules and privileges above mentioned.

Section 1 of the act declares what shall be unlawful. Section 2 provides a civil remedy against corporations for such violations.     Section 3 provides a criminal remedy against natural persons.     Section 4 provides a civil remedy against both corporations and natural persons in favor of any one who may be injured or damaged by the things legislated against in the first section.

Section 5 has reference to the matters contained in section 3.

Now, was it competent for the legislature to provide a civil remedy against corporations and a criminal remedy against natural persons? Is there any good reason for the discrimination? It seems that there is a good reason in the fact that it is impossible to punish corporations by imprisonment, a kind of punishment which can be inflicted only upon natural persons. Again, the deprivation of business or charter rights, or the deprivation of the power to exercise business or charter rights within the State, through a judgment of ouster, is a legal consequence which cannot be inflicted upon natural persons in the very nature of things, because wholly inapplicable to them. The argument of the defendant is, in substance, that inasmuch as natural persons may be consigned to the penitentiary under this act by a criminal prosecution, therefore, if ousted at all from the State, a corporation should be ousted by the same sort of a prosecution. This seems to us a *non sequitur*. The punishment inflicted upon the corporation is one peculiar to corporations, and is inflicted in the same manner in which this form of correction has been applied to corporations ever since there has been any public redress at all in this State for corporate wrongs, and is the same, in substance, which has been applied by English-speaking people for a time beyond which the memory of man runneth not to the contrary.

The defendant insists that it should have been indicted. To what purpose? To suffer in a criminal case a judgment which has for ages been held appropriate only in civil controversies. Has the defendant a right to complain because it was sued in equity, instead of indicted in the criminal court? Why should it have been indicted? It could not have been imprisoned, and no fine was authorized against it. If the statute had declared a fine against it, an indictment would have been proper, or, if the act had simply declared unlawful the things it denounced, there might still have been an indictment as for a misdemeanor; but, having declared in terms the legal consequences of a breach of the legal inhibition, there could be no indictment. But the defendant says: "The legal consequences of the breach I am to have imposed upon me, and am to suffer through the machinery of a court of equity, when I cannot have the benefit of the reasonable doubt, or the benefit of the statute of limitations, which the sovereign concedes in criminal cases, but does not in its own suits in civil courts; and I am also deprived of the right to a general verdict of guilty or not guilty according to the course of practice in criminal courts." But suppose we turn the case about, and consider what a natural person might say. He complains: "I am subjected to the humiliation of an indictment for a felony, and if convicted I may be sent to the penitentiary for a term of years, while a corporation that does the same thing is subjected mere-

ly to the loss of a civil power, the right to do business. While I am subjected to the humiliation of the criminal court, a corporation for the same act enjoys the benign principles that are administered in a court of equity." Is not the case of the natural person as strong in the matter of discrimination as that of the corporation? What then? Is it true that for the same breach of duty a corporation and a citizen must both be indicted, although, owing to the differing natures of the natural person and the legal person, the same punishment cannot be inflicted, although it is impossible to reach the same end as to both by the same means, and although as to the natural person it may result in imprisonment in the penitentiary for ten years and as to the corporation only in a fine or money judgment? Would there be no inequality in that result? But will it be said that the legislature might have authorized an indictment and annexed as punishment the forfeiture of corporate franchises in case of domestic corporations and ouster for foreign corporations? If so, there would have been converted into a criminal sentence a judgment which has been, from time immemorial, held to be but a civil determination. Shall all these hoary precedents be overturned to attain a state of harmony with an abstract theory? The true theory is that corporations and natural persons are so diverse in some respects that there is no basis or common ground of comparison, but a necessity of simple antithesis. And such is the

particular aspect in which they are presented in the present litigation.

For the reasons stated, we do not think the defendant has sustained the objections made in the sixth, ninth, tenth, and eleventh assignments.

In what has been said we have assumed that foreign corporations doing business in the State are entitled to the same status and rights as domestic corporations; and in truth they are so entitled under the act in question (chapter 140, Acts of 1903), in respect of proceedings to stop them from doing business here, and it seems from the authorities cited that they have been treated with the same consideration in many other States.    But it is well to remember, and to remark, that they have no contract rights with the State.  They are here merely on sufferance, guests, as it were, of the State, and have no right to complain of the procedure which the State has adopted to try the question whether they have abused the courtesy shown them, and have thereby forfeited a continuance of it.    That the power exists in the State to otherwise deal with them is shown and illustrated in *Insurance Co.* v. *Craig,* 106 Tenn., 621, 641, et seq., 62 S. W., 155, wherein the court sanctioned the provision in the insurance laws of the State, giving power to the insurance commissioners, without proceedings in the ordinary courts of the State, to exclude foreign insurance companies for certain violations of law, after they had obtained a license

to do business here.    The principle is so obvious that we need not pursue it further.

What has been said disposes of the seventh and eighth assignments, which are, in effect, that the chancellor erred in not applying the statute of limitations.    There is no statute of limitations applicable to the State in civil actions.    Shannon's Code, sec. 4453.

There is, indeed, a statute of limitations embraced in the Code (Shannon's Code, secs. 6942-6945), but not at all applicable to the present case.    Under these sections the limitation for gaming is put at six months; other misdemeanors, twelve months.    Certain charges of felony are subject to the following limitations, viz.:

Prosecutions for breaches of trust, petit larceny, rape, attempt to commit rape, enticing any unmarried female for the purpose of marriage or prostitution, negligence punishable by imprisonment in the penitentiary, or any offense punishable by imprisonment in the penitentiary, where the punishment is expressly limited to two years and less, are all limited to three years next after the commission of the offense.    Section 6944.    For perjury and subornation of perjury, and all offenses not embraced in section 6944, where the punishment is expressly limited to five years or less, the limitation is five years.    None of these limitations could in any event apply to a prosecution under section 3 of the act in question here, because the offense therein created is a felony, notwithstanding the punishment may be by fine and imprisonment in the penitentiary not less than

one or more than ten years, or, in the judgment of the court, by either fine or imprisonment. *Rafferty* v. *State,* 91 Tenn., 655, 657, 658, 16 S. W., 728.     On the last page referred to it is said: "The fact that the punishment for the attempt is in the alternative, either by imprisonment in the penitentiary or by fine and imprisonment in the county jail, does not make it any less an offense punishable by imprisonment in the penitentiary, or take from it the characteristic of a felony." Therefore the limitation for misdemeanors would not apply, and the case does not fall within any of the excepted classes of felonies.     Nor does the case before us fall within the class of cases represented by *Turley* v. *State,* 3 Heisk., 11.     Those are cases wherein several crimes were included in one indictment, under the principle of gradation.     Here we have, under the third section, a single crime with alternatives of punishment.

We shall next consider the fourth, fifth, and twelfth assignments.

The fourth assignment is that the chancellor erred "in not finding and decreeing that the alleged agreement, arrangement, or combination, if unlawful, was unlawful for that it was in violation of the acts of congress relating to interstate commerce only, and not in violation of the said act which is chapter 140 of the Acts of 1903, and beyond the jurisdiction of that court."

The fifth assignment is that the chancellor erred "in not finding and decreeing that if the alleged arrange-

120 Tenn—10

ment, agreement, or combination be a violation of the said act of Tennessee of 1903, it is such violation only because it violates provisions of said act regulating interstate commerce, and which for that reason are void, and that no decree can be entered in this cause for a violation thereof."

The twelfth assignment is that the chancellor erred "in not holding and decreeing that the said act is null and void, for that it is in violation of article 1, sec. 8, subsec. 3, of the constitution of the United States, in that it is an attempted regulation of commerce among the several States."

On the subject referred to in these three assignments the case arising in the present record is substantially the same as considered by the court in *Standard Oil Co.* v. *State,* 117 Tenn., 618, 100 S. W., 705, 10 L. R. A. (N. S.), 1015 (Holt's Case), and we are content to reproduce here what was said in that case, viz.:

"The legislature was cognizant, we must presume, that it had no power to enact laws regulating interstate commerce, and did not intend to enact an unconstitutional law, in whole or in part. There was already then in force an act of congress (the Sherman anti-trust act, enacted in 1890) fully covering that subject, the provisions of which were much broader and more effective than those of this act, and could be enforced to their fullest extent by the stronger and more vigorous government. There was neither the power nor the necessity for enacting any legislation relative to interstate

commerce.    The wrongs to trade which were intended to be corrected and punished were those being perpetrated against commerce within the State which congress could not reach, and for which there was then no efficient remedy.    The only statute then in force in Tennessee relative to these abuses was one making it an ordinary misdemeanor for two or more persons to conspire to commit any act injurious to public morals, trade, or commerce (Shannon's Code, sec. 6693), and that there was a necessity for a more drastic one was a matter of common knowledge and generally recognized, and the enactment of this statute was an attempt to supply it.

"We give no force to the word 'importation,' appearing in section 1, because we think it was inaccurately used in referring to articles already imported; that is, that the phrase 'importation or sale of articles imported into this State' was intended to include and describe, among the articles of commerce to be protected, those which had been imported from other States and countries, commingled with the common mass of property in this State, and no longer articles of interstate commerce.    It is well settled that commerce in such imported articles may be regulated by State legislation. *American Steel & Wire Co.* v. *Speed,* 110 Tenn., 546, 75 S. W., 1037, 100 Am. St. Rep., 814; *Id.,* 192 U. S., 500-519, 24 Sup. Ct., 365, 48 L. Ed., 538.    It is certain that merchandise of this character was intended to be included within the provisions of this act; otherwise,

commerce in the vast amount of valuable property of foreign production and manufacture that was then and is now in this State would be wholly unprotected from the abuses legislated against.   In no other way is such property mentioned, included, or referred to in the statute, and this phrase must be held to apply to it. A large part of the wealth of the people of the State is invested in imported property, and it cannot be presumed that the legislature intended to discriminate against it.   It needed the same protection as that of domestic growth or manufacture.   The legislature clearly intended to prohibit trusts, combinations, and agreements affecting all commerce not covered by the federal statute, and upon which it had a right to legislate.   It did not intend to stop short of its power or to exceed it.

"The case of *Rector of Holy Trinity Church* v. *United States*, 143 U. S., 457, 12 Sup. Ct., 511, 36 L. Ed., 226, is much in point here.   There it is said:

" 'It is a familiar rule that a thing may be within the letter of the statute, and yet not within the statute, because not within its spirit, nor within the intention of its makers.   This has been often asserted, and the reports are full of cases illustrating its application. This is not substitution of the will of the judge for that of the legislator; for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow

from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.'

"And again:    'The construction invoked cannot be accepted as correct.    It is a case where there was presented a definite evil, in view of which the legislature used general terms, with the purpose of reaching all phases of that evil, and therefore, unexpectedly, it is developed that the general language thus employed is broad enough to reach cases and acts which the whole history and life of the country affirm could not have been intentionally legislated against.    It is the duty of the courts, under those circumstances, to say that, however broad the language of the statute may be, the act, although within the letter, is not within the intention of the legislature, and therefore cannot be within the statute.'

"But, if the act did prohibit the abuses legislated against in the importation of articles in this State, such provision does not vitiate the entire statute.    It is constitutional and valid, so far as it affects commerce in articles which have been imported into the State and become commingled with the common mass of property of the State and subject to its laws, as articles of domestic production and manufacture.

"It is evident, from what we have already said, that the prevention of unlawful contracts in relation to the importation of articles was not the inducement of the enactment of this statute, but that the primary and

chief purpose of the legislature, beyond all question, was
to protect commerce within the State.    Its provisions
upon this subject are to no extent and in no manner
dependent upon one protecting the importation of mer-
chandise from other States and countries.    They are
complete, and capable of effective enforcement without
one in relation to interstate commerce.    Such statutes,
notwithstanding they contain clauses regulating inter-
state commerce, a matter not within the power of the
States, have frequently been sustained and enforced by
this court and the supreme court of the United States,
so far as they relate to commerce within the State.
*State* v. *Scott,* 98 Tenn., 254, 39 S. W., 1, 36 L. R. A.,
461; *Austin* v. *State,* 101 Tenn., 579, 48 S. W., 305, 50
L. R. A., 478, 70 Am. St. Rep., 703; *Kidd* v. *Pearson,*
128 U. S., 1, 9 Sup. Ct., 6, 32 L. Ed., 346; *Plumley* v.
*Massachusetts,* 155 U. S., 461, 15 Sup. Ct., 154, 39 L.
Ed., 223.

"The plaintiffs in error are also mistaken in their
conception of the charge made in the indictment, and
of the object and effect of the evidence introduced to
prove it.    The express averments of both counts of the
indictment are that the defendants therein named con-
spired, contracted, and agreed with S. W. Love for the
purpose and with a view to lessen and destroy full and
free competition in the sale of a certain article of sale,
coal oil, imported into this State; and the proof intro-
duced by the State upon the trial was for the purpose
of proving an agreement to lessen and destroy competi-

tion in the sale of coal oil which had, previous to the agreement, been imported into the State, and was then stored and upon sale at Gallatin. There is no averment that the agreement was made with a view to lessen, or intended to lessen and destroy, competition in the sale of coal oil to be imported by the Evansville Oil Company, and no proof was offered to that effect.

"The charge upon which the plaintiffs in error were indicted, tried, and convicted is the alleged making of an unlawful contract and agreement with S. W. Love to lessen and destroy competition in the sale of coal oil which the Standard Oil Company had imported into this State, and had, at the time of the agreement, stored in its storage tanks at Gallatin; and there offered for sale. The charge is that the agreement was made to protect oil already imported, and not oil to be imported. The evidence offered tended to prove an agreement conceived and effected by the Standard Oil Company and its agents to protect the oil of the principal then stored in Gallatin from competition with that about to be imported and offered for sale by a competitor, and not to protect that of the Evansville Oil Company yet to be transported there.

"A combination affecting interstate commerce is none the less a violation of the federal anti-trust statute, and punishable under it, where the agreement made incidentally affects intrastate commerce; and the same rule will apply to combinations made in violation of the statute of the State upon the same subject, where

interstate commerce is incidentally affected.    If it were otherwise, neither the federal nor the State laws could be enforced in any case.

"The importation of oil to be made by the Evansville Oil Company was only the occasion, the incentive, of the conspiracy charged in relation to that theretofore imported by the Standard Oil Company.

"It is true the oil of the Standard Oil Company had been an article of interstate commerce; but it was not when the agreement with S. W. Love was made.    It was then at rest in this State, and was subject to its revenue laws and the police power of the State.    That it was subject to the revenue laws is conceded by the Standard Oil Company, and it had taken out a license and paid the revenue required and imposed by the laws of the State.    That it was in its then condition subject to the police power of the State cannot be doubted. *Am. Steel & Wire Co.* v. *Speed,* 110 Tenn., 546, 75 S. W., 1037, 100 Am. St. Rep., 814; *Id.,* 192 U. S., 500-519, 24 Sup. Ct., 365, 48 L. Ed., 538; *Brown* v. *Houston,* 114 U. S., 622, 5 Sup. Ct., 1091, 29 L. Ed., 257; *Pittsburg, &c., Co.* v. *Bates,* 156 U. S., 577, 15 Sup. Ct., 415, 39 L. Ed., 538."    117 Tenn., 642-648, 100 S. W., 705, 712, 10 L. R. A. (N. S.), 1015.

This brings us to the assignments filed to test the correctness of the chancellor's ruling upon certain items of evidence.    These assignments are Nos. 13 to 20, inclusive.

The thirteenth, fourteenth, fifteenth, and twentieth

assignments are to the action of the chancellor in re-
fusing to admit oral evidence of the contents of a re-
port which was made by Mr. Holt to Mr. Comer. There
was no error in this action of the chancellor.   It ap-
pears from the evidence of Mr. Holt that the report re-
ferred to was prepared in triplicate, and one copy sent
to Mr. Comer at Nashville, one to the Cincinnati office,
and the other retained by himself, and that the copy re-
tained by himself was still in his possession.   There is
some evidence, but not of a satisfactory nature, that the
copy sent to Mr. Comer and that sent to the Cincinnati
office had been mislaid or destroyed, incident to moving
the Nashville office to Louisville, and the Cincinnati
office to Covington, Kentucky; but if this evidence be
treated as establishing the fact of such misplacing or
loss of the Nashville and Cincinnati copies, no reason
is assigned for the failure to produce that retained by
the witness Holt.   All these were originals, and second-
ary evidence of their contents could not be properly
admitted while either was in existence and accessible.
2 Wigmore on Ev., secs. 1232, 1233; 2 Elliott on Ev.,
sec. 208.

The sixteenth assignment questions the action of the
chancellor in excluding, on exception of complainant,
a paper purporting to be a copy of a letter written by
Mr. Comer to Mr. Holt, December 24, 1903. The ground
of the exception in the court below was that said paper
offered purported to be a copy copied into a transcript
on file in the supreme court, and because it was an at-

tempt to prove by oral testimony the contents of an alleged letter, when the original thereof had been given by Holt to J. E. Comer, special agent of the defendant, and a letter-press copy thereof was in the Nashville office of the defendant, as shown by the testimony of Mr. Collings, the vice president of the company.

We are unable to find in the testimony of Mr. Collings anything about a letter-press copy in the office at Nashville; but the existence of such copy is a fair inference from a statement contained in the evidence of Mr. Holt. However, aside from this, we do not think that the absence of the original is properly accounted for.    Therefore the objection was properly sustained in the court below, and the assignment must be overruled.

The seventeenth assignment is based on the following ruling of the chancellor in refusing to admit a paper purporting to be a copy of a letter written by Mr. Collings to Mr. Comer, under date of December 26, 1903.    In stating the ground of the objection in the court below, it was said by the counsel for the State: "It is claimed that said letter was sent to said Comer as special agent, and therefore it should be among the papers of defendant company at its Nashville office, and moreover, said Collings only thinks, and does not know, that said copy is out of his own letter book."

The eighteenth assignment relates to the action of the chancellor in sustaining an exception to a paper purporting to be a copy of a letter addressed to Mr. Collings by Mr. Comer on December 28, 1903.    The

ground of the objection was that the absence of the original was not satisfactorily accounted for, and that, while Mr. Collings produces what purports to be a tissue copy, he has no personal knowledge of it, but "thinks he got it from Nashville, and thinks it was furnished to him by Mr. Coons."

The nineteenth assignment is based upon an objection, sustained in the court below, to the testimony of Mr. Collings in relation to an alleged letter, under date of December 28, 1903, and an alleged copy of said letter, claimed to have been written by him to J. E. Comer. The ground of the objection was: "Because the original of said letter is not produced, but said Collings shows that he sent the original of said letter to Comer, and he has no personal knowledge of the alleged tissue copy produced by him and copied into the record as above stated."

We shall consider these three assignments together. The record sustains the ground of the objection referred to in the seventeenth assignment. The assignment must therefore be overruled. The testimony of Mr. Collings sufficiently accounts for the absence of the original of the letter referred to in the eighteenth assignment; but he does not properly account for the alleged tissue copy, and on this ground the chancellor acted correctly in sustaining the objection. This assignment is therefore overruled. The record sustains the objection made in the court below to the paper re-

ferred to in the nineteenth assignment.    That assignment is therefore overruled.

This brings us to the merits of the controversy, suggested by the second and third assignments, which are in substance that the chancellor erred in not dismissing the original bill on the merits, and in finding and decreeing that the defendant was in fact guilty of a violation of the provisions of the said anti-trust act of 1903.

The facts are stated with substantial correctness in the original bill.    There is no doubt that Mr. Comer was in control of Middle Tennessee in behalf of the defendant, as its manager within the district to which that division of the State belonged under the apportionment made by the defendant among its agents and servants.    Mr. Comer testifies that his "territory" was East Tennessee up to Bristol, Middle Tennessee, a small portion of Kentucky, North Carolina, and a small portion of northern Georgia—no inconsiderable domain; that he was general manager for this territory, and had general superintendency of the marketing of defendant's products therein, and control of its local agents and salesmen.    Mr. Holt was denominated a "salesman." His territory was Middle Tennessee, in which was located the town of Gallatin.    He would cover his territory once in each month.    His duties were to sell refined oil, gasoline, and naphtha, also special goods, such as candles and oil, grease, heaters, and lamps, to call on the merchants who bought from tank wagons, sell them additional storage, and arrange the routes so as to make

it convenient for the agent to dispose of each tank wagon load of oil on each trip to the country; also to call on the merchants in regard to the service that the company's local agents were giving them at the various points where substations had been established, and finding out whether the agent was attending to his duties in delivering oil promptly, and ascertaining whether they had any complaints to offer against the agents in attendance; also to go down to the station or warehouse, where the tanks were located, and to look over the storehouse to see if everything was in order; also to take an inventory of the oil on hand, and go over the reports of the local agent, to learn whether he was making them properly and making them up properly. He was under the control of Mr. Comer, and was required to report on all these matters to him. Holt says in his testimony: "I was to make a complete report every day of pretty near everything I said."

O'Donnell Rutherford was what is called a "subagent," or "local agent." His duties were to receive oils shipped to Gallatin for distribution, to make deliveries of such oils under the supervision and direction of the Nashville office, and to render to that office reports covering his sales and the work that he performed at Gallatin, and to make daily reports. These daily reports were required to show sales made at Gallatin, and he was to send in invoices, and to make deposits in the local banks, and report such deposits. The daily reports were not required to cover the quantity of oil on hand.

He was required to take an actual inventory and report the amount then on hand at the close of each month. This report was required to specify the number of inches of oil in the storage tank; also the number of barrels of oil or other goods he might have in his storage tank or warehouse.    By the number of inches in the storage tank is meant this:    For example, if a storage tank had a diameter of ten feet, the agent was required to put a rod into the tank and get the number of inches of oil in that storage tank, and if it was five feet, or sixty inches, he reported that as the amount of oil on hand in the storage tank.    From the data thus furnished a computation would be made at the main office, and thereby the number of gallons on hand ascertained. The subagent as a rule was required to send in a memorandum report to the main office over him—in this case, the Nashville office—once a week, to enable the stock clerk to know the amount of oil on hand, so that he could order oil before the exhaustion of the supply; but this was never considered necessarily an accurate inventory.

Over Mr. Comer, Mr. Holt, and Mr. Rutherford was Mr. Collings, the second vice president of the company and its general manager, who was located at Cincinnati. However, he gave no orders to Holt or Rutherford. They looked only to Comer, who was their immediate superior.

Mr. Comer did not fix prices.    This was the duty of Mr. Collings.

State v. Standard Oil Co.

At the date of the transaction complained of in the present proceeding the defendant had on hand, stored at Gallatin, 15,363 gallons of oil. Gallatin was its distributing point for the surrounding country, for about twenty or twenty-five miles.

The defendant had practically a monopoly of that market when Mr. Rosemon, agent of the Evansville Oil Company, appeared in Gallatin and vicinity and sold sixty barrels of oil.

At this date, about October 5, 1903, there was considerable complaint, by the purchasers of oil and its consumers in Gallatin and in the neighboring country, of the inferior grade of oil which the defendant was selling. The explanation offered by defendant was that it had received a bad tank of oil, and the inference was that when that tank was used up a better grade would be put on the market. However, there had been, from time to time, complaints during the preceding twelve months or so of inferior oil. The complaint made by consumers, at the particular period we have under examination, was that the oil had water in it and would sputter. There is some evidence on the part of the defendant that the complaint was purely imaginary, and that the oil burned well. However, the weight of the evidence is that it was an inferior grade of oil.

The oil which was sold by Mr. Rosemon, as agent of the Evansville Oil Company, was of a very much superior grade to that sold by the defendant, and only one cent higher; that oil having been sold at fourteen

and one-half cents, while the defendant was selling its oil at thirteen and one-half cents. But, when the difference in quality is taken into consideration, the evidence shows that the oil of the Evansville Oil Company was worth two and one-half cents more than that of the defendant company; that is to say, the defendant was selling an inferior grade of oil at a high price.

When Mr. Comer learned that the agent of the Evansville Oil Company had sold sixty barrels of oil at Gallatin, he summoned Mr. Holt from a distant part of his territory to go to Gallatin and look after his trade. His instructions to Mr. Holt were to get the orders countermanded. Mr. Holt acquiesced in the direction and obeyed it, with the following result:

He proceeded to Gallatin, and in company with the local agent, Mr. Rutherford, called upon Mr. S. W. Love. Mr. Love, on being asked to state what took place, said, referring to Holt: "He came in and asked me—said, 'What will you take to countermand that order?' And I said, 'What order?' And he said, 'This 10-barrel order you bought from Rosemon.' I said, 'I don't know; what will you give me?' He said, 'I will put you one hundred gallons of oil in the tank, if you will countermand it.' I studied a while, and told him I would do it. You see, I got more out of the one hundred gallons than out of the ten barrels and no trouble, so I turned it down right straight. Q. What did you do then? A. We went around to the telegraph office, and he wrote the dispatch out, and I signed it, and

he paid the charges.  Q.  You went together to the tele-graph office?  A.  Yes, sir.  Q.  And he wrote it out? A.  And I signed it, and he paid the charges."

A copy of the telegram was shown to the witness and identified, as follows:

"Gallatin, Tennessee, Oct. 12, 1903.

"To Evansville Oil Co., Evansville, Ind.  Kindly countermand my order for ten barrels oil.

[Signed]    S. W. Love."

The witness was further asked:  "Did anything else pass between you and Mr. O'Donnell Rutherford and C. E. Holt, with reference to this matter?  A.  No, sir.  Q.  You have stated all that happened?  A. Yes, sir."

The witness stated that he did not enter into any agreement with Mr. Holt or Mr. Rutherford, or any other agent, of the Standard Oil Company, to increase the price of oil, or reduce competition in oil in Gallatin; that he did not enter into any such agreement with Mr. Lane, Mr. Cron, or Mr. Hunter; that he did not know of the countermand of the other orders until after they were countermanded.  He also stated that he did not make any agreement with reference to the oil that the defendant had stored at Gallatin; that he did not know as a matter of fact how much the company had on hand at the time; but that it had storage room enough to "keep two or three cars."

He further testified that the one hundred gallons of

120 Tenn—11

oil promised him to countermand his order was delivered
to him the next day or the day after.

On cross-examination he testified:

"Q. Why did they tell you they wanted to counter-
mand that order? A. I don't know, sir, unless it was
to stop the oil from coming in here. Q. Wasn't it to
prevent that oil coming here in competition with their
own oil which was being sold here in Gallatin? A. It
looks to me that it was. Q. And that was your un-
derstanding at the time, wasn't it? A. Yes, sir; I
think it was."

On re-examination he said:

"You said that your understanding was that that or-
der was countermanded to stop competition. Did you
mean by that you had an understanding with Holt or
Rutherford to that effect, or that is your interpretation
of what was done? A. That is my interpretation of
what was done. Q. Did you have any understanding
with them about it? A. No, sir. Q. No discussion of
that point in any manner, shape, or fashion? A. No,
sir; I just supposed that was what it was done for. Q.
Just a supposition of yours? A. Yes, sir."

The transaction with Mr. Lane is thus stated in his
testimony:

"State what happened with reference to countermand-
ing this order of yours. A. Well, some time late in the
evening—I suppose it was October 12th. You say that
is the date. Q. That is the date of the Love transaction.
A. Well, Mr. Rutherford and Mr. Holt, the Standard

Oil representatives, came over to our place of business and asked me if I didn't want to countermand the order for that oil, and I said, 'What oil?' and he said, 'The oil you bought from the Evansville Oil Company,' and I said, 'No, I guess not,' and he says, 'Why, what is the matter?' and he went on to say he had secured the countermand of all the other merchants that had bought oil from him here, and I had just as well countermand my order, for I would not get the oil, as they would not ship five barrels of oil here. And I says: 'Well, there is no use of countermanding if they will not ship it. I will just let it go.' And Holt and Rutherford, one or possibly both of them, spoke up and said: 'If you will countermand the order we will give you fifty gallons of oil.' And I says: 'All right; let her rip.' So they got out a telegram, and wrote out a countermand, and asked me to sign it, and said they would send it. That was the last I heard of it. I asked Mr. Rutherford if he would see that I got the oil, and he said he would."

Mr. Rutherford thereupon delivered to Mr. Lane the following:

"October 1, 1903.

"This is to guarantee that I will give you fifty gallons of oil free, for the consideration that I cancel my order given to the Evansville Oil Co.

"[Signed]                    O. D. RUTHERFORD,

"Agent Standard Oil Co."

The peculiar phraseology of this paper, in the use of the pronouns, is accounted for by the fact that Lane

himself drew up the paper and handed it to Rutherford for signature. In his testimony Lane calls it "a due-bill" for the oil which was promised him.

In original examination, this witness was asked:

"Q. Now, did you enter into any combination, or agreement, or conspiracy, or contract? A. That was all the agreement I had with anybody. Q. To lessen the competition in oil at Gallatin, or increase the price, or enhance the price of anything of that kind? A. Not that I knew anything about. All I did was to give an order for oil, and countermanded it, under the circumstances I stated. Nothing was said about any conspiracy or agreement. Q. Did you agree, with reference to that matter, with the other merchants, Mr. Cron and Mr. Hunter and Mr. Love? A. I didn't see the other merchants at all. The only men I saw was Holt and Rutherford. Q. Did you send any word to them, or did they send any word to you? A. No, sir; nothing said at all. Q. Did you know they had or had not, when you did? A. Only by what Holt said. Q. He said he had seen them? A. Yes, sir. Q. That they had countermanded theirs, and yours would not come? A. Yes, sir; that the oil would not come; that they had had to get a car load to get it at fourteen cents."

In cross-examination he was asked:

"And you understood the oil which you were given to countermand this order was to be brought to you as you wanted it from that tank over there. A. Well, that was the agreement we had. Q. I mean the oil you were get-

ting from these people was to come from over there? A. The oil from the Standard Oil Company? Q. Yes. A. I didn't hear where it came from. It was to be brought in the wagon and delivered at my store. Q. That was what you understood? A. I understood they were to deliver it to me as I wanted it. Q. And they did do it? A. Yes, sir."

He was further asked:

"Q. What was their reason for giving you this oil? A. Gave it to me to countermand the order, he said; just said, 'I will give you fifty gallons to countermand the order.' Q. To keep that oil from being brought here and sold by you in competition with other oil here? A. I presume so. Q. That was your understanding with them? A. That would naturally be my supposition, of course. Q. That was the supposition and understanding at the time? A. I guess it was."

Further along in his testimony, in answer to other questions, he said he supposed it would destroy competition, and again, "as a matter of course it would."

In re-examination he was asked:

"What was the understanding? A. That I was to countermand the order for the consideration of fifty gallons of oil. Q. Did you have any understanding with him in any way that this should be done in order to affect the price of oil or reduce competition in oil at all? A. Nothing said about that. Q. Was there anything understood about that between you and him? A. No, sir; I don't suppose there was. There was nothing said

about it. Q. Was there any agreement to that effect?
A. No agreement between us. No, we didn't say any-
thing about conspiring with anybody or anything. That
was all that was said. They didn't stay in my store five
minutes; no longer than you could write out that agree-
ment and sign it there."

The transaction with Mr. Cron was in substance this:

Mr. Holt called on Mr. Cron and asked him to cancel
the order, because it would be to the interest of O'Don-
nell Rutherford, who lived at Gallatin, and was a home
boy, and was working for the company, and ought to be
encouraged, etc. This failing to move him, Mr. Holt
offered him fifty gallons of oil to make the cancellation
or to countermand the order. Mr. Cron, however, had
heard that Mr. Love had been promised one hundred
gallons, and stood out for the same figure, and Mr. Holt
finally yielded and agreed to give that number of gal-
lons. Thereupon the telegram was sent by Mr. Holt,
in the name of Mr. Cron, countermanding the order.
Mr. Cron says he was informed by Mr. Holt that Lane,
Love, and Hunter had countermanded their orders. He
says that he did not make the agreement for the pur-
pose of preventing competition, but admits that he
knew that it would have that effect; also that he did
not make the agreement with a view to the oil in storage
at Gallatin, but he knew that large quantities were
kept on storage there, and that "it was delivered right
straight along after that."

The transaction with L. C. Hunter was simply that he

was contemplating the countermand of the oil, in any event, because of a misrepresentation made to him by Mr. Rosemon, to the effect that some other merchants had purchased who had not in fact purchased. However, he had not decided upon the matter, but was considering it, when Mr. Holt came into his store (ten miles from Gallatin), and a conversation ensued between them. He told Mr. Holt that he had about decided to countermand the order, and Holt said: "Hunter, I am going to give you fifty gallons of oil." Thereupon the telegram was written out and signed by Mr. Hunter, and was taken to Gallatin by Mr. Holt and transmitted.

It is insisted that Mr. Comer did not authorize the giving of the oil to the merchants to induce them to countermand the orders, and that he knew nothing of the fact that oil had been so given until about the 23d of December, 1903, when one S. P. Wilson informed him that he had just been told by James D. Whitesides, a former resident of Gallatin, that the oil had been used in the manner stated; that he thereupon communicated, by telephone, with Rutherford, and the latter came down to Nashville and confessed to the fact that the oil had been given away in the manner stated. It is testified by Wilson, and by Comer, that a shortage of three hundred gallons of the oil had been discovered, and that several letters had been written to Rutherford for an explanation; but they had not been replied to. Mr. Wilson testifies that on the 23d of December, when Mr.

Comer called up Mr. Rutherford, he (Comer) said that he had taken Rutherford sharply to task about the shortage, and had told him that he was going to charge it up to him. Rutherford testifies that he had reported his inches on the 1st of December, and Rosemon testifies that on the 6th or 7th of December Rutherford told him that the shortage had then been charged to him. It is insisted by defendant that Rutherford and Holt made an agreement between themselves to keep it a secret from Mr. Comer, and Mr. Comer says he did not know it until the 23d. Mr. Rutherford says that he did not tell Mr. Comer until the 23d, and Mr. Holt that he did not confess it to Mr. Comer until the 24th or 25th, of December.

An important fact in this particular connection is that by the 23d of December the occurrence had begun to be noticed in the press, particularly in a paper at Gallatin. In this paper the matter was discussed and a prosecution threatened against the company and all the parties concerned. The Nashville American had called up Mr. Comer for an interview. He declined to be interviewed, saying only that he did not sanction the giving away of the oil, but did not wish to discuss the matter in the newspapers. Mr. Holt testifies that Mr. Comer was greatly agitated. He says that he likewise was greatly agitated himself.

Truly it would have been a very remarkable transaction if Mr. Holt had entered upon such a scheme on his own responsibility. He and Mr. Rutherford say that Holt was to pay for the oil himself, that is, pay Mr.

Rutherford, so that he could account for it to the company, and the use of the oil would never be discovered; that they both agreed to say nothing about it. Yet the four merchants knew it, and they were not bound to secrecy, nor asked even not to divulge it. Mr. Honeywell, one of the officers of the Evansville Oil Company, arrived in Gallatin on the 1st of November, when his company's sixty barrels of oil reached there. He promptly called upon Mr. Love for an explanation of the countermand, and Mr. Love told him that the Standard Oil Company had written the telegram. At the same time he called upon Mr. Cron, and Mr. Cron said that he told him how it was that the countermand was made. Mr. Cron does not mention the name of Mr. Honeywell, nor does Mr. Love; but, from the testimony of Mr. Honeywell that he was the man who called and made inquiry, we are satisfied that it was to him statements were made. Mr. Comer says that Mr. Honeywell was in his office in December, and was talking about the countermand. We think he was mistaken about the date, and that it was in November. Mr. Honeywell identifies the date he was in Tennessee by the time of the arrival of his company's oil at Gallatin. Mr. Rosemon testifies that on the 6th or 7th of December Mr. Rutherford told him about the gift of the oil. Mr. Rutherford admits they had a talk about the matter, but says that it arose from Mr. Rosemon's upbraiding him about giving away the oil to get his orders countermanded, and that he (Rutherford) replied that he was not responsible for it

and had been charged with the oil.  Mr. Rutherford tes-
tifies that Mr. Holt was his "boss," and he thought he
knew what he was doing.  Mr. Holt testifies that he had
no idea that he was violating the law at the time, and
says that he thought that a man had a right to give away
what belonged to him any time he wished.  It further
appears that the amount of oil given away, according to
current prices, aggregated $40.50, while Mr. Holt's
salary was only $65 a month.  It seems singular that he
would give away two-thirds of a month's salary in such
an enterprise.  He offers the explanation that he
thought, as he expressed it, that it would be a feather in
his cap, and that he might get an increase of salary.  He
says, further, that he tried argument along the line that
his company had superior facilities for delivery by town
wagons, in quantities as needed, etc., and that O'Donnell
Rutherford was a Gallatin boy, and that his home peo-
ple ought to stand up for him, and, finding this of no
avail, then he offered to make the gifts of oil.  It seems
this is true as to Mr. Cron, so far as concerns the per-
sonal argument made in support of Rutherford, but
not as to either of the others.  Mr. Love testifies, as al-
ready stated, that Mr. Holt made him the plump propo-
sition at the outset to give him the one hundred gallons
of oil.  Mr. Lane says the same thing in substance.
Neither of these witnesses testify as to any argument
or persuasion.  We infer from the record that Love was
the first man he approached.

There is another singular circumstance.  It is this:

As already stated, Mr. Holt testified that he was required to make a daily report so minute that it would contain almost everything he said.  He made a report on the day he succeeded in getting the orders countermanded.    The testimony shows that that report was made out in triplicate form.  One copy was sent to Mr. Comer, one to Cincinnati, and the other was retained by himself.  If it be conceded that the copy sent to Mr. Comer and that sent to Cincinnati have both been lost or unintentionally mislaid, still it is developed that the copy retained by Mr. Holt was in his possession when the evidence was taken, and it was not produced.    The court cannot do otherwise than to draw from this circumstance an inference unfavorable to the defendant in respect of the contents of that paper.

Furthermore, Mr. Holt testifies that the defendant company appeared to appreciate what he had done at Gallatin; that is, that he had succeeded in getting the orders countermanded.  And while the evidence is to the effect that Mr. Comer charged the oil—that is, the three hundred gallons—to Mr. Rutherford, he urged Mr. Holt to pay the sum to Mr. Rutherford, and he did pay it, though he says he did so out of his own means, and not until May, 1906.  It also appears that the defendant company kept Mr. Rutherford in its employ for nearly two years after the transactions above mentioned—that is, after the giving away of the oil—and until he resigned on account of ill health, and that it kept Mr. Holt in its employ for nearly four years, using

his services part of the time in Kentucky, part of the time in Huntsville, Alabama, and afterwards in Texas or the Indian Territory. It is true that Mr. Comer rebuked Mr. Holt, and also rebuked Mr. Rutherford, about the gifts of oil; but at this time the occurrence had attracted adverse public attention and comment in the public press, with threats of prosecution, and Mr. Comer was greatly agitated thereby.

After fully considering all of the circumstances, we are constrained to believe that Mr. Comer sanctioned the acts of Mr. Holt immediately after they were done, if he did not in fact advise them beforehand.

What was done was within the apparent scope of Mr. Comer's authority, since he was the general manager of the territory, and was charged with the marketing of the defendant's products therein.

As the result of the cancellation or countermanding of the orders referred to, competition in and around Gallatin was suppressed. Shorty afterwards—that is, within a week or two—the price of defendant company's inferior oil was advanced from $13\frac{1}{2}$ cents to $14\frac{1}{2}$ cents per gallon.

It is true that the defendant's witness testifies that the prices it makes upon oil are fixed by Mr. Collings at the home office in Cincinnati (now in Covington, Kentucky), and that they depend upon the prices of the raw material or crude oil at primary points and the rates of freight; that prices fluctuate through the year, and

that through a series of years, from 1903 to 1905, the defendant has reduced prices at Gallatin, as follows:

January 1, 1903, 14½ cents; April 28, 1903, 14 cents; June 5, 1903, 13½ cents; October 27, 1903, 14½ cents; March 8, 1904, 14 cents; May 24, 1904, 13½ cents; January 17, 1905, 13 cents; February 22, 1905, 12½ cents; April 24, 12 cents; June 15, 1906, 11½ cents; August 18, 1906, 11 cents.

We think the facts make out a case against the defendant, falling clearly within the authority of *Holt's Case (Standard Oil Co.* v. *State)* 117 Tenn., 618, 100 S. W., 705, 10 L. R. A. (N. S.), 1015.

In the case referred to it was held that corporations and their officers and agents who conceive and carry out a conspiracy can both be considered and counted in the two or more necessary to constitute an unlawful conspiracy; that this is true under the act on which the present litigation is based, and also on sound principle aside from the statute. 117 Tenn., 663-670, 100 S. W., 718, 10 L. R. A. (N. S.), 1015. On the page last referred to it is said:

"We are of the opinion that, independent of statute upon principle, and in furtherance of sound public policy, both corporations and their officers and agents who engage in the conspiracy must be held to be parties to it, and be counted in computing the necessary number to constitute it."

Mr. Comer instructed Mr. Holt to go to Gallatin and have the orders countermanded. Mr. Holt agreed to go,

and did go, and carry out the instruction. Here was an agreement between the corporation, represented by Mr. Comer, and Mr. Holt, a natural person, to do the act. Mr. Holt proceeded to Gallatin and had conferences with Mr. Love, Mr. Lane, and Mr. Cron, in which they each agreed with Mr. Holt and Mr. Rutherford, representing the company, that they would cancel their several orders, and they accordingly did cancel them. Now, aside even from the principle above quoted from *Holt's Case*, here were unlawful agreements and arrangements entered into between the defendant company and certain natural persons, producing an unlawful combination; and the first section of the statute not only covers unlawful combinations between natural persons among themselves, and corporations among themselves, but, under a true construction, combinations between corporations and individuals.

The tendency of the agreements and arrangements above referred to, and we think the inevitable purpose, under a fair deduction from the evidence, was to lessen competition with the defendant's business at Gallatin in respect of the oil it had on storage there and was offering for sale. It is immaterial that it would have the like effect upon oil which might thereafter be imported into Gallatin by the defendant and poured into its storage tanks at that place. It is likewise immaterial that nothing was said between Love, Lane, Cron, and Hunter on the one side, and Holt and Rutherford on the other, as to the purpose of the several arrangements entered into,

or the tendency thereof.   It appears from the testimony, clearly, of Love, Lane, and Cron, that they well knew what the purpose was, and the inevitable tendency. That Holt knew it goes without saying, since he went to Gallatin for the express purpose of endeavoring to suppress competition by shutting out the oil of the Evansville Oil Company.   The inevitable tendency was to stifle competition as to the fifteen thousand gallons of oil then in the storage tanks, as well as all the oil that might thereafter stand at rest in those tanks.   Likewise it is true, in a broader sense, that the purpose and tendency of these arrangements was to protect the defendant's local business at Gallatin.

We have found from the record that the means which were adopted, the gifts of oil, were either known beforehand by the defendant, or really sanctioned, afterwards; but we do not think this circumstance is essential as an element of the wrongful agreement.   The unlawful agreements having been entered into to have the orders countermanded and to countermand the orders, it was not necessary that the special means for effecting the result should be agreed upon beforehand. If the means employed were adapted for the purpose of carrying out the unlawful agreements entered into, and were used in execution thereof, they would be presumed to be within the contemplation of all concerned in such unlawful agreements.

It is said in the brief of counsel that it is wholly unreasonable to suppose that Love and the other persons

at Gallatin who accepted oil would have agreed for the consideration mentioned to assist the Standard Oil Company in suppressing competition, and thereby giving to that company a monopoly which could be used against them to control prices at will. It would seem strange if we did not know that men everywhere are constantly, for small present considerations, sacrificing the hopes and promises and rewards of the future. It was certainly an absurd thing for them to do; but that they did it we think the record most clearly shows.

Particular reference is made to the table of prices above referred to, showing that oil fluctuated at Gallatin both before and after the advent of the Evansville Oil Company, and that through a course of years thereafter it actually declined. This is true. However, the fact is not thereby removed that the unlawful agreements referred to had a tendency to lessen competition and to increase the price of oil.

It is said that, while the securing of countermands is not a proper way to conduct business, yet under the custom of trade a merchant has the right to countermand an order, and hence there is nothing unlawful in making such countermands. There is evidence of such a custom in the record, and if the merchants referred to had made those countermands for their own purposes, unmoved by combination or agreement with a third party—in this case, the defendant company and Holt and Rutherford—there would have been no ground of action.

"The difference, in legal contemplation between in-
dividual right and combined action in trade," said the
court in *Bailey* v. *Master Plumbers,* "is seen in numer-
ous cases.

"Any one of several commercial firms engaged in the
sale of India cotton bagging had the right to suspend
its sale for any time it saw fit.    Yet an agreement be-
tween all of them to make no sale for three months with-
out the consent of the majority 'was palpably and un-
equivocably a combination in restraint of trade.' *India*
*Bagging Association* v. *Koch,* 14 La. Ann., 168.    Any
one of several companies had the right to sell the whole,
or only a part, of its output to only such persons, and
only such territory, and at only such prices as it pleased.
Yet it was inimical to the interests of the public and
unlawful for them to combine and agree that those mat-
ters should be determined and controlled by an agency
jointly created for that purpose.    *Arnot* v. *P. & E. Coal*
*Co.,* 68 N. Y., 558, 23 Am. Rep., 190; *Morris Run Coal*
*Co.* v. *Barclay Coal Co.,* 68 Pa., 173, 8 Am. Rep., 159.
The same was held to be true, as to the individual com-
pany and the combined company, respectively, in the
*Sugar Trust Case* (previously cited), 3 N. Y. Supp., 401,
2 L. R. A., 33, and 54 Hun, 354, 7 N. Y. Supp., 406, 5
L. R. A., 386.

"So, one railroad company has the unquestioned right
to charge reasonable rates for transportation, but it is
not lawful for competing companies to mutually bind

themselves to maintain those rates. *United States* v. *Trans-Missouri Freight Association,* 166 U. S., 290, 17 Sup. Ct., 540, 41 L. Ed., 1007; *United States* v. *Joint Traffic Association,* 171 U. S., 505, 19 Sup. Ct., 25, 43 L. Ed., 259. Individual boat proprietors may establish rules and rates for the conduct of their separate business; but the law does not allow them to form a combination and by mutual agreement establish joint rules and rates. *Hooker* v. *Vandewater,* 4 Denio (N. Y.), 349, 47 Am. Dec., 258; *Stanton* v. *Allen,* 5 Denio (N. Y.), 434, 49 Am. Dec., 282. One grain dealer is perfectly free to decide for himself what price he will offer for grain; but he is not allowed to enter into an agreement with the other grain dealers of his town, and thereby fix the price that all of them shall offer. *Craft* v. *McConoughy,* 79 Ill., 346, 22 Am. Rep., 171.

"A single brewer may fix his own price for the beer he sells. Nevertheless it is unlawful for an association of brewers to regulate the sales of its members. *Nester* v. *Continental Brewing Co.,* 161 Pa., 473, 29 Atl., 102, 24 L. R. A., 247, 41 Am. St. Rep., 894."

*Bailey* v. *Master Plumbers,* 103 Tenn., 118, 119, 52 S. W., 857, 46 L. R. A., 561.

We do not think that it is material that the evidence fails to show that Love, Lane, Cron, and Hunter united in a single agreement with the defendant and Holt and Rutherford to do what was done. It was sufficient that either one of these purchasers from the Evansville Oil Company combined or agreed with the defendant

State v. Standard Oil Co.

company to do the act which was in violation of the statute. *Holt's Case,* supra.

On the grounds stated, and for the reasons given, we are of opinion that there was no error in the decree of the chancellor; and it must be affirmed.